## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ANDERSON DIVISION

| | |
|---|---|
| IN RE: LANDAMERICA 1031 EXCHANGE SERVICES, INC., INTERNAL REVENUE SERVICE § 1031 TAX DEFERRED EXCHANGELITIGATION <br><br> _____ <br><br> Angela M. Arthur, as Trustee of the Arthur Declaration of Trust, dated December 29, 1988; Vivian R. Hays, an individual; Leapin Eagle, LLC, a limited liability company; Denise J. Wilson, an individual; Gerald R. Terry, an individual; Ann T. Robbins, an Individual; and Jane T. Evans, an individual; on their own behalf and on behalf of a class of others similarly situated, <br><br>                    Plaintiffs, <br> vs. <br><br> SunTrust Bank; Theodore L. Chandler, Jr.; G. William Evans; Stephen Conner; Ronald B. Ramos; Devon M. Jones; and Brenton J. Allen, <br><br>                    Defendants. <br><br> _____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No.: MDL No. 2054** <br><br> **Southern District of California** <br> **C.A. No. 3:09-cv-00054** <br><br> **District of South Carolina** <br> **C.A. No. 8:09-cv-00415** <br><br> **AMENDED CONSOLIDATED COMPLAINT FOR:** <br><br> **1. BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** <br><br> **2. CONVERSION AND AIDING AND ABETTING CONVERSION** <br><br> **3. CIVIL CONSPIRACY** <br><br> **4. NEGLIGENCE** <br><br> **5. FRAUD AND FRAUDULENT CONCEALMENT** <br><br> **6. CONSTRUCTIVE FRAUD** <br><br> **CLASS ACTION** <br> **[JURY TRIAL DEMANDED]** |

Plaintiffs, on behalf of themselves and all others similarly situated, for their Complaint against the Defendants herein, respectfully allege as follows:

## I.   NATURE OF THE ACTION

1.      Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031(a), permits a seller of investment property to defer the payment of capital gains taxes on the proceeds of the sale by using those proceeds to purchase "like-kind" replacement property.  Section 1031 requires a seller to

identify such like-kind replacement property within 45 days from the date of the sale of the original investment property, and provides that the seller has 180 days within which to close on the purchase of replacement property.  If the transaction is not properly completed within these time periods, the seller loses the Section 1031 tax benefit.

2.    Section 1031 also prohibits the seller from taking possession of the proceeds of the sale of investment property, although it does permit the seller to use a "safe harbor" to preserve the tax benefit.  One such safe harbor permits the seller to use a "Qualified Intermediary," ("QI") to receive and hold the proceeds until the seller is ready to close on the replacement property. Treas. Reg. §§ 1.1031(k)-1(g)(4)(i).

3.    This is a class action brought by the seven named Plaintiffs against SunTrust Bank ("SunTrust") for the benefit of approximately 400 similarly situated persons and entities (the "Exchangers"), who lost millions of dollars (the "Exchange Funds") entrusted to LandAmerica 1031 Exchange Services, Inc. ("LES") to "hold" in order to facilitate their respective Internal Revenue Code §1031 exchanges ("1031 Exchanges") and deposited by LES at SunTrust from February 2008 until November 24, 2008.   Plaintiffs' Exchange Funds are gone.  LES spent the Exchange Funds to pay off prior clients whose money was lost when LES imprudently used their Exchange Funds to purchase Auction Rate Securities ("ARS") from a SunTrust subsidiary. The ARS are now unmarketable.  SunTrust substantially assisted LES in converting the Plaintiffs' Exchange Funds in hopes of being repaid the $100 million remaining on a $200 Million revolving line of credit SunTrust had originally loaned LES's parent, LandAmerica Financial Group, Inc. ("LFG"), in July of 2006.  SunTrust assisted LES in operating a Ponzi scheme hoping the scheme would go undetected long enough for the ARS market to unfreeze or for LFG to sell its "good

assets" to raise the funds needed to repay SunTrust. The scheme failed and this litigation followed.

4.        Both LES and LFG filed for bankruptcy on November 26, 2008.   This action is brought against certain non-debtor Defendants who (i) knowingly breached fiduciary duties owed to the Plaintiffs and assisted LES in breaching fiduciary duties owed to Plaintiffs; (ii) converted and knowingly assisted LES in converting trust funds it held for the benefit of Plaintiffs; (iii) committed fraud on the Plaintiffs; (iv) conspired with others to injure Plaintiffs; and (v) were negligent.

## II.    INTRODUCTION

5.        At all times relevant to this Complaint, LES was a Qualified Intermediary  (a "QI") established for the purpose of assisting Exchangers in performing Section 1031 Exchanges in order to defer payment of capital gains taxes.

6.        As a part of the Exchange transactions, the Exchangers signed agreements ("the Exchange Agreements") transferring legal title of their Exchange Funds (received from the sale of relinquished property) to LES to hold between 1 and 180 days while they identified and then purchased replacement property.  LES's **legal** interest in this regard was explicitly time- and event-limited.  The same Exchange Funds received from the sale of the relinquished property were to be used to fund the purchase of replacement property.

7.        In its filings with the SEC, LFG acknowledged that LES "is obligated to its customers for the return and availability of proceeds of the like-kind exchange funds."  These same SEC filings also reported that "these like-kind exchange funds… **are held by us for the benefit of our customers** and are therefore **not included as our assets** in the accompanying consolidated balance sheets."  [Emphasis added].

3

8.      Contrary to the representations made by LES in the Exchange Agreements signed by LES and Plaintiffs, LES purchased ARS with Exchange Funds deposited at SunTrust from SunTrust's related entity, SunTrust Robinson Humphrey, Inc.  The ARS were viewed as an opportunity for LES to earn additional income and be paid more interest. Then, as reported to the SEC by LFG, in "February 2008, the auctions for ARS failed when sell orders exceeded buy orders as a result of liquidity issues in the global credit markets.  The failure of these auctions has disrupted the expected liquidity of these investments, thereby resulting in depressed fair values of ARS."

9.       These events resulted in LES's parent, LFG, recording a contingent obligation of $60.5 million for the difference between the fair market value and the par value ARS held in LES in September 2008.  Yet despite this financial debacle, LES continued to accept millions of dollars of Exchange Funds from Exchangers and SunTrust continued to accept the funds in accounts maintained by LES with SunTrust.

10.     Instead of filing for bankruptcy, LES continued operating through a Ponzi scheme with a trust deficit using newly deposited Exchange Funds to pay for older escrows pending at LES.

11.     SunTrust knew that the ARS purchased by LES had declined in value because its subsidiary sold the ARS to LES and LFG had borrowed $100 million from SunTrust, which required underwriting by SunTrust.

12.     SunTrust knew that LES was operating a Ponzi scheme and assisted LES in operating the scheme by physically accepting deposits of new Exchange Funds and physically assisting the payment of older escrows at LES with full knowledge of all the facts.

4

13.     SunTrust participated in the Ponzi scheme because it wanted to be repaid the $100 million it had loaned to LFG.  The plan was to defraud the Exchangers long enough for the ARS market to open back up or for LFG to sell its "good assets" to repay SunTrust.  Instead, like the game of musical chairs, the music stopped and the current 400 plus Exchangers were left standing.

## II.    JURISDICTION AND VENUE

14.     This Court has jurisdiction over this Class Action pursuant to 28 U.S.C. § 1331, the Class Action Fairness Act of 2005 codified in part at 28 U.S.C. § 1332(d) and § 1453 because: (i) it consists of at least 100 proposed class members; (ii) the citizenship of at least one putative class member is different from that of the Defendants; and (iii) the aggregate amount pleaded in controversy exceeds $5,000,000.

15.     This Court has personal jurisdiction over the Defendants because:  (i) they each conducted business in California and/or South Carolina; (ii) received and converted Exchange Funds derived from California and/or South Carolina; (iii) made or aided and abetted the making of false statements in California and/or South Carolina; (iv) and knowingly assisted LES in breaching fiduciary duties owed Californians, South Carolinians and others. Venue is proper here because one or more failed 1031 Exchanges occurred in this District and in the Southern District of California.

## III.    PARTIES

### A.    Plaintiffs

16.     Plaintiff **Angela M. Arthur ("Arthur")** is a **Trustee of the Arthur Declaration of Trust, dated December 29, 1988 (the "Arthur Trust")**.  The Arthur Trust owned "relinquished property" located at 1017 Sycamore Avenue, Vista, California which was sold to facilitate the

intended purchase of like-kind "replacement" property.  Arthur, on behalf of the Arthur Trust, entered into an "Exchange Agreement" with LES dated October 1, 2008 whereby the equity in the relinquished property was transferred to LES on October 15, 2008 to be deposited in trust at SunTrust for the sole and exclusive purpose of funding Plaintiff's purchase of replacement property. The Arthur Trust lost $466,781.73 in Exchange Funds.

17.    Plaintiff **Vivian R. Hays ("Hays")** is an individual residing in Hayden, Idaho. Hays owned relinquished property located in San Joaquin County, California, which was sold to facilitate the intended purchase of like-kind replacement property.  Hays entered into an Exchange Agreement with LES dated November 11, 2008 and her equity in relinquished property was transferred to LES on November 14, 2008 to be deposited in trust at SunTrust for the sole and exclusive purpose of funding Plaintiff's purchase of replacement property.  Vivian Hays lost $383,912.13 in Exchange Funds.

18.    Plaintiff **Leapin Eagle, LLC**, a New York Limited Liability Company**, ("Leapin Eagle")** does business in Brooklyn, New York.  Leapin Eagle owned relinquished property in Hildago County, Texas, which was sold to facilitate the intended purchase of like-kind replacement property.  Leapin Eagle entered into an Exchange Agreement with LES dated July 31, 2008.  Its equity was transferred to LES on August 27, 2008, to be deposited in trust at SunTrust for the sole and exclusive purpose of funding Plaintiff's purchase of replacement property.  Leapin Eagle lost $ 468,372.67 in Exchange Funds.

19.    Plaintiff **Denise J. Wilson ("Wilson")** is an individual residing in Tacoma, Washington. Wilson owned relinquished property in Pierce County, Washington, which was sold to facilitate the intended purchase of like-kind replacement property.  Wilson entered into an Exchange Agreement with LES dated September 22, 2008 and her equity was transferred to LES

on October 2, 2008 to be deposited in trust at SunTrust for the sole and exclusive purpose of funding Plaintiff's purchase of replacement property. Denise Wilson lost $98,599.31 in Exchange Funds. A copy of Wilson's Exchange Agreement (which is similar to all class members' Exchange Agreements) is attached hereto as **Exhibit 1**.

20.    Plaintiff **Gerald R. Terry** is a citizen and resident of the County of Anderson, State of South Carolina. Plaintiff **Jane Terry Evans** is a resident and citizen of the County of Horry, State of South Carolina. Plaintiff **Ann Terry Robbins** is a citizen and resident of the State of Georgia. Plaintiffs Terry, Evans and Robbins are siblings (collectively **"Terry Plaintiffs"**) who co-owned as tenants in common relinquished property in Anderson County, South Carolina, which was sold to facilitate the intended purchase of like-kind replacement property. The Terry Plaintiffs entered into an Exchange Agreement with LES with a stated date of October 29, 2008. Their equity in the relinquished property located at 1000-1032 West Park Drive, Anderson, SC (the "Springs Apartments Relinquished Property") was transferred to LES on November 10, 2008 to be deposited in trust at SunTrust for the sole and exclusive purpose of funding the Terry Plaintiffs' purchase of replacement property. The Terry Plaintiffs lost $731,608.61 in Exchange Funds.

### B.    Defendants

21.    Defendant **SunTrust Bank ("SunTrust")** is a corporation organized and existing pursuant to the laws of the State of Georgia, with its principal place of business in the State of Georgia. SunTrust engages in retail investments and trading, banking services, financial services, and asset management services to retail and institutional clients. SunTrust provided these services to LES, the corporate trustee of Plaintiffs' Exchange Funds. Pursuant to the Exchange Agreements entered into by all Plaintiffs with LES, Exchange Funds generated from the sale of relinquished

properties were transferred to SunTrust in Richmond, Virginia, into a commingled business account at SunTrust in the name of LES, for the sole purpose of using these Exchange Funds to acquire Plaintiffs' replacement properties.   SunTrust knowingly assisted LES in breaching its fiduciary duties and converting the Plaintiffs' Exchange Funds by allowing the Funds to be used to fund older exchanges at LES, which could not be funded because of LES's imprudent investments in ARS sold to LES by SunTrust's subsidiary.

22.     Plaintiffs are informed and believe that Defendant **Theodore L. Chandler, Jr. ("Chandler")**, is a resident and citizen of the Commonwealth of Virginia and at all times relevant hereto was Chairman of the Board of Directors and Chief Executive Officer of LandAmerica Financial Group, Inc. ("LFG"), the corporate parent of LES.   Chandler knowingly participated in the wrongful acts set forth below.

23.     Plaintiffs are informed and believe that Defendant **Stephen Conner ("Conner")** is a resident and citizen of the State of Illinois and at all times relevant hereto was Senior Vice President of LES and LFG.  Conner knowingly participated in the wrongful acts set forth below.

24.     Plaintiffs are informed and believe that Defendant **G. William Evans ("Evans")** is a resident and citizen of the Commonwealth of Virginia and at all times relevant hereto was Executive Vice President and Chief Financial Officer of LFG and served on the Board of Directors of and was an officer of LES.  Evans knowingly participated in the wrongful acts set forth below.

25.     Plaintiffs are informed and believe that Defendant **Ronald B. Ramos ("Ramos")** is a resident and citizen of the Commonwealth of Virginia and at all times relevant hereto was Vice President and Treasurer of LES and Senior Vice President and Treasurer of LFG, and knowingly participated in the wrongful acts set forth below.

8

26.     Plaintiffs are informed and believe that Defendant **Devon M. Jones ("Jones")** is a resident and citizen of the Commonwealth of Virginia and at all times relevant hereto was Vice President and Assistant Treasurer LFG and LES.  Jones knowingly participated in the wrongful acts set forth below.

27.     Plaintiffs are informed and believe that Defendant **Brenton J. Allen ("Allen")** is a resident and citizen of the Commonwealth of Virginia and at all times relevant hereto was Vice President and National Underwriting Counsel of LES and assistant secretary of LFG, who knowingly participated in and aided and abetted LES in the wrongful acts set forth below.

28.     Defendants Chandler, Conner, Evans, Ramos, Jones and Allen are collectively referred to herein as the "Individual Defendants."

## IV.    FACTUAL ALLEGATIONS

29.     The allegations made in this Complaint have been based on information and belief, except those allegations that pertain directly to Plaintiffs, which are based on personal knowledge. Plaintiffs' information and belief are based on the investigation conducted by Plaintiffs and Plaintiffs' attorneys after their retention.  Each and every allegation and factual contention contained in the Complaint has evidentiary support found in the record developed in the bankruptcy litigation pending in the Bankruptcy Court for the Eastern District of Virginia, Eastern Division.

*IRC §1031 Allows for the Deferral of Capital Gains When Like-Kind Property is Exchanged by the Taxpayer Within 180 Days and the Taxpayer Does Not Receive the Proceeds of the Sale.*

30.     Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031 ("Section 1031") allows the seller/taxpayer of investment property, the "relinquished property," to defer payment of capital gains on the taxable proceeds of the sale by using the proceeds to purchase "replacement

9

property." To take advantage of Section 1031, the taxpayer must identify like-kind replacement property within 45 days of the sale of the relinquished property, and then purchase the replacement property within 180 days from the sale of the relinquished property.

31.    Section 1031 was amended in 1991 so that the seller and its agents are prohibited from taking actual or constructive receipt of the proceeds from the sale of the relinquished property; however, "safe harbors" were created to preserve the tax deferral. One safe harbor used to avoid taking actual or constructive possession of the proceeds is to have a QI hold the proceeds until the taxpayer is ready to purchase replacement property.

32.    At the closing on the replacement property, the QI transfers the Exchange Funds to the seller of the like-kind replacement property, and then title to the replacement property is transferred to the taxpayer. The business of 1031 Exchanges may be graphically depicted as follows:

### 1031 EXCHANGE



33.    Section 1031 prohibits the seller of property from taking actual possession or receipt of the proceeds at any time during the 180-day maximum time period for completing the 1031 transaction. The QI takes possession as a "strawman" to hold the Exchange Funds in trust

while substitute property is acquired and then transfers those Funds directly to the escrow established to complete the purchase of the replacement property. The 180-day time limitation causes the "roll call" of existing clients of the typical QI to turn over at least every 180 days.

34.     Exchange Funds are held by the QI until the earliest of the following occurs: (i) replacement property is purchased (which can be simultaneous with or as early as 1 day after the sale of relinquished property); (ii) the seller fails to identify replacement property within 45 days or declares that he will not; or (iii) the seller is unable to purchase the replacement property within 180 days. If the Exchanger fails to purchase replacement property, the Exchange Funds are returned to the Exchanger and he must pay the capital gains tax on the sale of the relinquished property.

> *LES was a QI Assisting Clients to Perform 1031 Exchanges for a Set Fee and a Percentage of the Interest Earned on the Deposit of the Exchange Funds at SunTrust.*

35.     LES's principal business was serving as a QI for like-kind property exchanges under Section 1031. LES, for valuable consideration, offered to exchange for others their investment real estate in compliance with Section 1031. LES marketed its QI services through its network of internal title agency affiliates who marketed these services to individual, commercial, and institutional real estate investors. LES received billions of dollars of Exchange Funds to hold for its clients.

36.     The Exchange Agreements limit LES's compensation for its trustee service to a set-up fee, typically around $1000 ($600 in the case of the Terry Plaintiffs up to $750 in the case of Plaintiff Wilson) and a $250 closing fee beyond the closing on the first replacement property.

37.     Although legal title to the Exchange Funds of the clients of LES was transferred to LES, the Plaintiffs retained the equitable rights in the proceeds except for the use and benefit of the

money during the 1 to 180-day exchange period.  Pursuant to Virginia state law, which governs the Exchange Agreements, the Exchange Funds were "escrow funds."  Upon the close of the escrow on the replacement property, or after 180 days if the replacement property escrow did not close, the Exchangers were entitled to immediate possession or use of the Exchange Funds.

38.    LES conveyed no consideration to Exchangers for receipt of the Exchange Funds, except nominal, below-market earnings and the promise to keep the Funds safe and **available** for the purchase of replacement property.  The Plaintiffs and other similarly situated Exchangers did not loan the money to LES.  They did not gift the money to LES. They did not invest the money in LES. They transferred legal title to the Exchange Funds to be held by LES in trust for their benefit for no more than 180 days.  The role of LES was to act **solely** as a QI to these Funds as agent and corporate trustee during the Exchange transaction.

39.    LES sales personnel were led to believe that Exchange Funds held by LES were all held in accounts that were not subject to losses.

40.    In fact LES was reaping "high margin" profits, at a greater than 50% profit margin, "accepting" the Exchange Funds.  The profit margin was based on  the low expense associated with holding the 1031 Exchange Funds.

41.    LES's Senior Vice President, Defendant Stephen Connor, describes LES's QI role as a "party that is not disqualified, who takes control and possession of a taxpayer's relinquished property, sells it, transfers it, receives the funds, and acquires replacement property or property of like kind within the parameters of [IRC] Section 1031."

*The Exchange Agreements.*

42.    Clients of LES executed Exchange Agreements where LES would serve as QI in order to comply with Section 1031.  See **Exhibit 1**.  As noted in the Exchange Agreements, the consideration for the transaction between the Exchanger and LES can be depicted as follows:



43.    Pursuant to the Exchange Agreements LES agreed to act on behalf of Plaintiffs and other similarly situated Exchangers, **solely** for the purpose of facilitating the Exchangers' exchange of the relinquished property for the replacement property.  The Plaintiffs and other similarly situated Exchangers controlled the selection of the relinquished property; the sales price and terms of sale of the relinquished property the timing of the sale; the selection, purchase price and terms of acquisition of the replacement property; the timing of acquisition of the replacement property within the parameters of Section 1031; and controlled the Exchange Funds to the extent of requiring that they be available to consummate the exchange.  The Plaintiffs and other similarly situated Exchangers required that LES: (i) hold and apply the Exchange Funds solely to purchase replacement property;  (ii) maintain availability of the Exchange Funds; (iii) make payment on Exchangers' behalf from the Exchange Funds to acquire the replacement property; (iv) act specifically in accordance with the Exchangers' Notice of Identification of replacement property; (v) pay deposits or option fees on Exchangers' behalf as directed in Exchangers' Notice of Identification; (vi) take all steps necessary to accomplish closing on the specific property identified by the Exchangers, on the date set by the Exchangers, for the specific price set by the Exchangers;

and, (vii) pay from the Exchange Funds the purchase price, real estate commissions, prorations of income and expense, closing costs, title insurance premiums, escrow fees and any other charges, all as determined by the Exchangers.  LES, for **all** purposes other than the actual or constructive receipt preclusion of Section 1031 and the regulations thereunder, was acting as agent for the Plaintiffs and other similarly situated Exchangers, with all the commensurate duties and obligations imposed by state law, including the fiduciary duties owed by the agent to its principals.

44.    Paragraph 2(a) of the Exchange Agreement states that "LES shall make payments **from the Exchange Funds** to acquire the replacement property."  Paragraph 2(a) defines "the Exchange Funds" as **the consideration received** from the sale of the relinquished property.  Paragraph 2(a) also requires that LES "**hold and apply** the Exchange Funds in accordance with the terms and conditions of this Exchange Agreement."   Paragraph 2(b) of the Exchange Agreement requires LES to "make payments **from the Exchange Funds** to acquire the replacement property."  Paragraph 6(a) of the Exchange Agreement provides that "LES has entered into this Exchange Agreement with the intention of being a 'qualified intermediary' within the meaning of Section 1.1031(k)-1(g)(4)(iii) of the Regulations and both parties acknowledge that **the Exchange Agreement is intended to satisfy the 'safe harbor' provisions** of Section 1.1031(k)-1(g) of the Regulations."  Subsection (b) of paragraph 6 goes on to provide that "LES is entering into this Exchange Agreement **solely for the purpose of facilitating taxpayer's exchange** of the relinquished property for the replacement property."  [Emphasis added].

45.    At the same time the Plaintiffs executed the Exchange Agreements they executed an "Acknowledgement" prepared by LES.  The Acknowledgment states "It is hereby acknowledged that pursuant to Section 2(c) of the Exchange Agreement … LES is **required to hold** the

Exchange Funds including Taxpayer's earning thereon, if any, **until the Termination Date**" as defined in the Exchange Agreement. [Emphasis added].

46.     There is no provision in the Exchange Agreement that grants beneficial ownership to LES of the properties or the Exchange Funds.  Rather the Exchange Agreements state that LES is to hold the Funds only until the 1031 Exchanges are complete or until the expiration of the statutory time periods within which to identify and acquire replacement properties.

47.     Based on its role as a fiduciary, LES was obligated to stop soliciting new clients once there was a deficit balance in the trust account caused by bad investments in ARS sold to LES by SunTrust's subsidiary.

*LES Deposited the Exchange Funds at SunTrust.*

48.     The Exchange Agreements required the Exchange Funds be deposited at SunTrust Bank in Richmond, Virginia.  Paragraph 3(a) of the Exchange Agreement provides for the Exchange Funds to remain on deposit at SunTrust, as evidenced by the following language: "Taxpayer acknowledges and agrees that the amount of the Exchange Funds may be in excess of the maximum amount of deposit insurance carried by the depository institution indicated above [SunTrust]."

49.     No clause or term in the Exchange Agreements authorized LES to move the Exchange Funds deposited at SunTrust out of the original FDIC-insured deposit account.  The Exchange Funds were transferred to LES "to hold" for safekeeping, and only for safekeeping, pending each Exchanger's 1031 Exchange.

50.     Pursuant to the terms of the Exchange Agreements, LES's standard practice was to place Exchange Funds into what is described as the SunTrust 3318 account.  The SunTrust 3318

account is a checking account, which was open and active for several years and was used to receive and disburse funds related to LES activities as a QI.

51.     Exchange Funds were wired or deposited to this account.  LES's investment and treasury activities were carried out through transfers in and out of this account.  LES also used the account generally as its operating account. Periodically, LFG would transfer funds into this LES account.

52.     Authorized disbursements from the SunTrust 3318 account included the funding of replacement property purchases and repayment of Exchange Funds to Exchangers who did not identify or purchase replacement property.

53.     Unauthorized transfers out of the SunTrust 3318 account by LES included transfers to investment accounts for investment and treasury activities, the purchase of imprudent investments such as the ARS, funding of operational charges such as payroll, funding dividends to LFG, all of which were taking place up to the date of the LFG and LES bankruptcies.

54.     The SunTrust 3318 account served as the primary focal point of LES's treasury/investment activities while it served as QI for its Exchange clients.  Absent client requests to the contrary, LES's Exchange Agreements required Exchange Funds be deposited in the SunTrust 3318 account.

*LES Invested the Exchange Funds in ARS to Increase Profits on the Spread.*

55.     Contrary to the language in each Exchange Agreement, which required the money to remain on deposit in the FDIC-insured SunTrust 3318 account, LES invested the Exchange Funds in a number of investment vehicles, including ARS.

56.     ARS are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions typically every 7, 14, 28 or 35 days.

ARS are issued with long-term maturities or even in perpetuity.  However, due to ARS's interest rate or dividend re-set features, these securities had been marketed as short-term instruments.  The ARS do not, however, bear any resemblance to cash management vehicles, and, in fact, federal regulations prohibit money market funds from investing in ARS.

57.     ARS are not cash equivalents and in March 2007 the Financial Standards Accounting Board ("FSAB") issued a decision precluding the listing of ARS on balance sheets as cash equivalents.

58.     LES's investments of Exchange Funds were made through brokerage relationships with, among others, SunTrust Robinson Humphrey, a subsidiary of SunTrust.  All of LES's investments were purchased using the Exchange Funds drawn from the SunTrust 3318 account.

60.     LES's investment/treasury actions with the Exchange Funds were made to meet specific goals relating to liquidity, interest yield, and safety – all goals mandated by an investment policy established by the Investment Funds Committees of LFG.

60.     LES earned income from QI fees charged to the Exchangers and the spread between the interest earned by LES on the Exchange Funds and the guaranteed rate paid to the Exchangers.

61.     LES's investment in ARS was intended by LES to earn more interest and therefore, more profit for LES, and its parent, LFG.   LES ultimately accumulated $290.5 million in ARS using client Exchange Funds.

*The ARS Market Froze in February 2008.*

62.     Beginning in early February 2008, auctions for ARS began to fail when potential buyers declined to bid on the securities. Each week thereafter more auctions failed. Because of these events, the investments in ARS became illiquid and LES encountered difficulty meeting its obligations to acquire replacement properties.

63.     Once the ARS market froze, LES was in constant contact with SunTrust regarding the LES liquidity problems with meeting its exchange obligations, seeking a solution involving SunTrust.  SunTrust strung LES along with the possibility that it would ultimately redeem the ARS.

*LES Ran a Ponzi Scheme After February 2008.*

64.     After February 2008, LES experienced a substantial decline in Exchange Fund inflows, while remaining obligated to meet redemptions for older transactions.  Outflows (exchange replacements, reinvestments, transfers to parent, settling intercompany charges) exceeded inflows by $474,039,601.  During this period there was $21,734,538 of intercompany settlements made by LES to LFG as part of outflows.  Inflows (new exchange transactions, reinvestments and intercompany transfers) decreased from $188,725,000 in March 2008 to $56,248,500 by October 2008.

65.     LES saw the substantial slow down of the economy and the effect of curtailed real estate transactions, as well as fewer 1031 Exchanges.  All the while the ARS remained frozen and LES continued to accept Exchange Funds from new clients, pursuant to Exchange Agreements, saying that client's Exchange Funds would be deposited in an FDIC-insured account at SunTrust and used to purchase their replacement property or returned to them.  As LES solicited new clients, it procured additional Exchange Funds, which were misappropriated by LES to fund prior 1031 Exchange transactions. LES was not "holding" the Exchange Funds deposited into SunTrust at all, but spending the money as it was received to meet its obligations to other Exchange Fund clients.

66.     A Ponzi scheme is defined as a fraudulent investment arrangement whereby an entity makes payments to old clients from monies obtained from new clients.  The person(s) in charge of a Ponzi scheme must have the intent to "hinder, delay or defraud" based on the Ponzi

scheme operator's knowledge that some clients will eventually not be paid.  The scheme is furthered each time the person in charge takes on a new client.

67.    Qualified Intermediaries who pay older exchanges with after-acquired funds when the trust is in a deficit operate a Ponzi scheme.  See *Taxel v. Surnow (In re San Diego Realty Exch.)*, 132 B.R. 424 (Bankr. S.D. Cal. 1991), *rev'd on other grounds*, 1994 U.S. App. LEXIS 10317 (9th Cir. Cal. May 2, 1994).   Even when an exchange business does not start out as a Ponzi scheme "once [the company] mismanaged and converted the funds of some clients, and kept taking in the business and assets of others, it quickly became that." *Manty v. Miller & Holmes, Inc. (In re Nation-Wide Exch. Servs*.), 291 B.R. 131, 149 n. 20 (Bankr. D. Minn. 2003) (stating that the case could be termed a resulting Ponzi scheme or Ponzi scheme by performance).

68.    The liquidity crisis at LES was evident for many months prior to its November 2008 bankruptcy filing.  In March the deficit was $70 million.  In April there was a negative difference of $66 million.  In May 2008 there was a negative difference in the inflows and outflows of the SunTrust 3318 account of $55 million.  In June the deficit was $29 million.  In July it was $56 million, in August $32 million, and in September $62 million.  These account deficits were unprecedented.

69.    In its first quarter 2008 10-Q, LFG reported the following to the investing public regarding LES's investments in ARS:

> Like-kind exchange funds not held at Centennial are invested in short-term treasury funds or in high quality, short-term commercial paper, including $290.5 million of auction rate securities ("ARS") at March 31, 2008.  ARS are structured to provide liquidity through a Dutch auction process by allowing existing investors to either rollover their holdings, whereby they would continue to own their respective securities, or liquidate their holdings by selling such securities at par.  Historically, the fair value of auction rate securities approximated par value due to the frequent resets through the auction rate process.  As a result of liquidity issues in the global credit and capital markets, the auctions for our ARS failed beginning February 2008 when sell orders exceeded buy orders. Our portfolio of ARS is comprised entirely

of student loan ARS of which 99.1% is guaranteed by government-sponsored enterprises. As of March 31, 2008, these investments were rated "A" or higher.  We believe the failures of these auctions do not affect the value of the collateral underlying the ARS and we continue to earn and receive interest on our ARS at contractually set rates. However, we have liquidity exposure to these securities to the extent that we would be required to utilize these securities to satisfy the purchase of properties.  Based on the credit quality of the underlying securities and the amount of funds we have historically held, we believe the risk of loss will not have a material adverse effect on our financial position or results of operations.

70.    In its second quarter 10-Q filed in July 2008, LFG still reported to the investing public that it did not believe there was any material risk of loss to its financial position or operations as a result of the ARS liquidity problem.  However, neither LFG nor LES ever disclosed directly to its customers that their Funds were invested in ARS.  In fact, the policy of LES was to refuse to provide information to any Exchanger who asked about LES's investment protocol.

71.    As the fall of 2008 approached, LFG reported in its September 2008 10-Q that "the lack of a normal market for auction rate securities also made it necessary for us to provide additional cash resources beginning in the third quarter 2008 to our 1031 exchange subsidiary to fulfill customer commitments."  By this time the situation had grown so severe that, in connection with a merger LFG was attempting to pull off, it agreed to pledge the ARS held for the benefit of its Exchange clients, rather than its own assets in hopes of securing a $30 Million stand-by credit facility.

72.    By the time the third quarter 10-Q was filed in October of 2008, the ARS crisis had caused LFG to default on the covenants in its loans to SunTrust.  The following excerpt from the 10-Q illustrates the severity of the situation:

The covenant violations, unless waived by the lenders, constitute an event of default under the agreements, giving the lenders the right to declare all principal and accrued interest payable immediately, and exercise other rights and remedies granted under the agreements. A declaration for immediate payment under either of these agreements also would constitute an event of default under our convertible

20

note obligations, enabling the holders of such indebtedness to require the immediate payment of such obligations.

\* \* \*

The effects of the severe downturn in the housing and mortgage markets also caused us to violate the financial debt covenants of our Note Purchase Agreement and our Credit Agreement as of September 30, 2008. We do not have access to the undrawn $50.0 million commitment amount remaining under the Credit Agreement as long as an event of default has occurred and is continuing. In addition, based on current projections, we are likely to not be in compliance with the financial covenants of these agreements as of December 31, 2008.

73.    In the third and fourth quarters of 2008, LFG was required to transfer $45 million to make "lulling" payments to close exchanges and keep the SunTrust 3318 account from overdrafting.  The lulling payments served to conceal LES's illiquidity from new exchangers, including Plaintiffs, who continued entering into new Exchange Agreement with LES.

74.    On October 6, 2008 Peter A. Kolbe ("Kolbe"), Senior Vice President and Government Affairs Counsel to LFG, admitted in correspondence to James G. Nixon, Chief Examiner for the Nebraska Department of Insurance, the elements of an ongoing Ponzi scheme operated by LES, stating "[a]lthough the Exchange Company [LES] is taking in approximately $50 million a month in new 1031 exchange funds, that level of influx will likely prove **insufficient to cover the expected liability** aging schedule. In short, without either an infusion of new capital or the substitution of liquid assets for the auction rate securities, the Exchange Company **may not be able to meet its obligations in the near future**." [Emphasis added].

75.    Thus, while the Exchange Agreements drafted by LES state that "the Exchange Funds" will be used by LES to purchase each client's replacement property, LES was in fact using the Exchange Funds to operate a Ponzi scheme.

76.    In an October 17, 2008 email, Defendant Ronnie Ramos stated to Defendant Bill Evans: " I made the decision to move $25 million from LFG Holdco to LandAmerica Exchange

[LES] this afternoon in anticipation of meeting 1031 Exchange disbursement requests we received totaling approximately $22 million for early next week . . . Also contributing to this decision was my concern that the bank group, SunTrust in particular, might "freeze" the LandAmerica holdco [LFG] account and not permit a transfer of funds to the exchange Company [LES] triggering a liquidity event early next week. At close of business today, following the activity outlined above, LandAmerica holdco [LFG] has about $17 million on hand. The Exchange Company [LES] has about $30 million in cash on hand, a $10 million par value bond (worth about $9 million) and the $290.5 million in ARS. With the decision not to open any more commingled accounts [for LES at SunTrust] and the large disbursements early next week, **I suspect we have a week, two at most before the Exchange Company [LES] runs out of cash** if we make all remaining holdco [LFG] cash available. I know we don't want to recognize a real loss, however, barring an acceptable lending solution from SunTrust, we need to consider selling the paper [the ARS]. . ." [Emphasis added].

77.     LES, on October 17, 2008, in the wake of Treasury Regulation 26 C.F.R. § 1.468B-6, had instituted a new policy that it would no longer use commingled deposits in its 1031 Exchange transactions.  Within days, LES and LFG recognized that such a move would quickly bring the Ponzi scheme to a halt and force the company into an irreconcilable "liquidity crisis."

78.     The decision to stop additional deposits into the commingled SunTrust 3318 account was rescinded by, among others, Defendants Chandler, Evans, Ramos, Conner, and Allen, on October 18, 2008 "in order to provide liquidity" to the SunTrust account to pay off old 1031 Exchanges.  Defendant Conner implemented this decision with full knowledge that the purpose of the change in policy was so that LES could continue operating by using new Exchanger's deposits to pay prior obligations in furtherance of its classic Ponzi scheme, in direct violation of Treasury

Regulation 26 C.F.R. § 1.468B-6.  This decision directly impacted the Terry Plaintiffs and their South Carolina Exchange transactions and the Arthur Plaintiffs and their California Exchange transactions by channeling their Funds into the SunTrust commingled account where the Funds were diverted by LES for its own purposes.

*LES and LFG File for Bankruptcy.*

79.     On November 12, 2008 LES/LFG bankruptcy counsel was already at work and had incurred $200,000 in legal fees, a fact that irrefutably would have been material to the dozens of Exchangers who deposited millions of dollars in Exchange Funds with LES after that date.

80.     On November 24, 2008, LES notified Plaintiffs and other similarly situated Exchangers that LES was 'terminating its operations' effective immediately. LES's November 24th letter also stated that LES "understand[s] that this situation is detrimental."

81.     On November 26, 2008, LFG and LES filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

82.     On the Petition Date, counsel for LFG and LES stated on the record that LES: (a) did not intend to consummate Section 1031 Exchanges that were subject to its executory Exchange Agreements; and (b) believed that the Funds it was holding in both segregated and commingled bank accounts were property of LES's Estate.

83.     As of the Petition date, the 400 class members' claims represented by the lost Exchange Funds totaled approximately $191 million and LES's parent owed SunTrust $100 million.

> *LES Admitted to SunTrust that Exchange Funds Were Not Assets that Belonged to LES, that LES Acted as a Fiduciary of these Funds, that the Exchange Funds on Deposit at LES Ultimately Belonged to the Exchangers, and that LES was Operating a Ponzi Scheme.*

23

84.     After the ARS market froze, class actions were filed against SunTrust.  In early August 2008, SunTrust agreed to repurchase outstanding ARS from individual "retail investors." LES asked SunTrust to be included in this settlement, arguing that LES "**is acting in a fiduciary capacity, with the funds ultimately belonging to the retail client [Exchangers]**." [Emphasis added].  LES further verified to SunTrust that its function as a QI was to "**hold in escrow**" the proceeds from the sale of the relinquished property. [Emphasis added].

85.     Minutes of the LFG Investment Funds Committee meeting on October 1, 2008 discuss its strategy and state in part, "[t]o date, there is no prospect of a loan with SunTrust . . . and the company is participating in the appeal process with both brokers to be considered as part of the settlement, since the Company **[LES] is acting in a fiduciary capacity, with the funds ultimately belonging to the retail client**."   [Emphasis added].

86.     In a letter to SunTrust dated October 7, 2008, Michelle H. Gluck ("Gluck"), Executive Vice President and Chief Legal Officer for LFG, on behalf of LES, requested that SunTrust provide liquidity to LES because of the ARS.  The letter to SunTrust disclosed what SunTrust had known since February 2008, that LES was using "its remaining non-ARS investments [the incoming Exchange Funds] to satisfy Clients' obligations" because "virtually all of the remaining **escrow** investments consist of ARS, of which approximately $152 million consist of illiquid ARS purchased through SunTrust Investment Services, Inc. or SunTrust Robinson Humphrey, Inc."  The letter implores SunTrust to either repurchase the ARS or provide full liquidity with respect to the ARS held by LES.  A similar letter was sent by Gluck to Citibank, another seller of ARS.  [Emphasis added].

87.     The LFG/LES letter to SunTrust (and Citibank) verified that LES holds funds from 1031 Exchange transactions "**in escrow as a fiduciary** until the funds (with the related interest)

are returned to customers to complete the 1031 exchange." It also states that an essential function of the QI is to "**hold in escrow**" the proceeds from the sale. LES also refers to Clients' "**escrow funds**" and "**escrow investments**" being used to invest in ARS. [Emphasis added].

88. The LFG/LES letters to SunTrust (and Citibank) also quoted the Congressional testimony of Linda Thompson, the SEC's Director of Enforcement, in which Thompson stated that "ARS **held by fiduciaries** on behalf of real estate investors are viewed by the SEC as retail holdings, thus subject to repurchase pursuant to the agreement." [Emphasis added].

> *LFG Represented to the SEC that Exchange Funds were not Assets that Belonged to LES in Filings Reviewed by SunTrust.*

89. LFG, as a public company registrant pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934, is required to file an annual report (Form 10-K) and quarterly reports (Form 10-Q) with the Securities and Exchange Commission (SEC).

90. In the Form 10-Q for the first quarter ending March 31, 2008, LFG expressed that it believed the failure of the ARS market did not affect the value of the collateral underlying the securities even though there was no market for ARS. LFG disclosed, in its discussion regarding off balance sheet arrangements, how its subsidiary LES facilitates tax-deferred property exchanges and declared that "[d]ue to the structure utilized to facilitate these transactions, reverse exchanges, and like-kind exchanges not held at Centennial [Bank] are not considered [LFG] assets and are not included in the accompanying consolidated balance sheets."

91. In the second quarter 2008 Form 10-Q, LFG stated that the ARS securities market was still illiquid and that LFG remained exposed to the extent LES needed those securities to provide liquidity to close like-kind exchanges. LFG acknowledged again that the Exchange Funds were not its assets or the assets of LES, its subsidiary.

92.     In the Form 10-Q for September 30, 2008, LFG once again stated that the ARS securities market was illiquid and that LFG remained exposed to the extent LES needed those securities to provide liquidity to close like-kind exchanges.  LFG acknowledged again that the Exchange Funds were not its assets or the assets of LES, its subsidiary.  LFG added that this result was "consistent with industry practice."

93.     Due to financial concerns, on June 30, 2008, SunTrust executed a Second Amendment to its Revolving Credit Agreement with LFG, reducing the principal amount available under the facility from $200 million to $150 million.  SunTrust, as a $100 million lender to LFG, received and reviewed the LFG financial disclosures and SEC filings as part of its underwriting. SunTrust's underwriting guidelines also provide that when loans are made by SunTrust involving a 1031 Exchange transaction "a complete copy of the fully executed Exchange Agreement is required to be received by SunTrust prior to making the loan."

94.     SunTrust has filed a Proof of Claim against LFG in bankruptcy for over $100 million.  SunTrust is seeking to be repaid its loan to LFG from trust assets held by LES by arguing that the Exchange Funds are property of the LES bankruptcy estate not the Exchangers.

> *QI Industry Ethical Standards Mandated that LES Act as a Fiduciary With Regard to the Exchange Funds, Information Known by SunTrust as an Affiliated Member of the FEA with its Own QI Business.*

95.     The Federation of Exchange Accommodators (the "FEA") established a Code of Ethics and Conduct (the "Code of Ethics") which its members pledge to abide by.  LES was a member of the FEA until the end of 2008.   SunTrust is an affiliated member of the FEA because it operates a subsidiary 1031 Exchange business called SunTrust 1031 Exchange Co.

96.     In its preamble, the Code of Ethics states: "Exchange Accommodators recognize that the fiduciary nature of the industry imposes obligations beyond those of ordinary commerce."

Article VI of the Code of Ethics begins with the statements that an Exchange Accommodator shall

act in the best interest of its Clients, and proceeds to outline a nonexclusive list of eight duties.

97.    As to accounting for monies and property, Article VI of the Code of Ethics states:

(a)    Every Exchange Accommodator shall have the responsibility to act as custodian  for all exchange funds, being money, property, other consideration or instruments received by the Exchange Accommodator from, or on behalf of the client, except funds received as the Exchange Accommodator's compensation. Every Exchange Accommodator shall invest exchange funds in investments which meet the "Prudent Investor Standard" and satisfy investment goals of liquidity and preservation of principal. For purposes of this section, the "Prudent Investor Standard" shall be violated if:

(1)    Exchange funds are knowingly commingled by the Exchange Accommodator with the operating accounts of the Exchange Accommodator (LES violated this with the knowledge of SunTrust);

(2)    Exchange funds are loaned or otherwise transferred to any person or entity affiliated with or related to the Exchange Accommodator (LES violated this with the knowledge of SunTrust); or

(3)    Exchange funds are invested in a manner that does not provide sufficient liquidity to meet the Exchange Accommodator's contractual obligations to its  clients and does not preserve the principal of the exchange funds.  (LES violated this with the knowledge of SunTrust).

98.    The FEA rescinded LES's membership after the bankruptcy filing.

*Other Examples of LES's Stated Intention to Act as a Fiduciary of the Exchange Funds, Which were Held in Trust or in Escrow at SunTrust.*

99.    LES represented to government officials that it held Exchange Funds deposited by

Exchangers in the capacity of a fiduciary or as an escrow agent.  The Kolbe October 2008 Ponzi

Scheme letter described that the essential function of LES as a QI is "to hold in escrow the

proceeds from the sale of one property and to disburse the same upon the purchase or exchange of

a new property of 'like kind.'"  Kolbe also stated that "at any given point, the Exchange Company

is holding **in escrow** proceeds from the sale of properties for the purchase of new property of like kind." [Emphasis added.]

100.    By letter dated October 20, 2008, Defendant Theodore Chandler, Jr., former Chairman and CEO of LFG, requested a meeting with Treasury Secretary Henry Paulson to seek liquidity assistance.  This letter requested immediate financial assistance from the federal government to preserve LFG's place as America's largest title insurance and real estate services company, described the company's inability to sell its $290 million holdings of formerly liquid ARS and referred to one of its functions as holding "**as a fiduciary** for Section 1031 exchanges." [Emphasis added].  Later in the same paragraph the letter referred to LandAmerica "**as a fiduciary** to facilitate IRS Section 1031 real estate transactions."   [Emphasis added].

101.    LES, in advertising entitled "The Financial Stability of LandAmerica," personally approved by Defendant Stephen Connor, Senior Vice President of LFG and LES, described the Exchange Funds in a heading as "**Funds Held in Trust**." The same characterization is found in the Executive Summary prepared on or about October 15, 2008 by Defendants Ronald Ramos and Devon Jones:  "**LandAmerica serves in a fiduciary capacity**" for its Exchange clients. [Emphasis added].

102.    Also, at all time material to the events alleged in this Complaint, LES maintained an Internet website in which it represented that Exchange Funds are held "in trust."  The website also trumpeted that LES "[a]s a member of [LFG], [has] unparalleled financial strength."

103.    Other LES promotional materials represented that unlike "the vast majority of QIs [which] provide inadequate financial guarantees or security for the net proceeds of your sale," LES "provides[s] 100% security of your funds at no additional cost through a guaranty of our parent company" LFG.

104.    LES represented that "in connection with **each** IRC § 1031 exchange involving LandAmerica 1031 Exchange Services, LandAmerica provides its clients with a signed, written guaranty of the availability of the full amount of exchange funds received under the Exchange Agreement."  This representation was false and known to be false.

105.    LES also represented that "the individual and combined financial strength of each of the operations within LandAmerica is reflected by high financial ratings from Standard & Poor's, Demoteck and Fitch ratings services."   LES never corrected the representations when their ratings were downgraded.

106.    These types of promotional materials were routinely mailed or emailed by LES to prospective clients after the initial intake.

> *LES Was Acting as a Fiduciary of the Exchange Funds Transferred by Exchangers to LES and Deposited by LES at SunTrust as an Agent Pursuant to the Exchange Agreement and State and Federal Law or, in the Alternative, as a Broker Pursuant to Virginia State Statutes Applicable to the Transaction.*

107.    LES was clearly acting as an agent for Exchange clients in all respects other than for the purpose of actual or constructive receipt under 26 U.S.C. § 1031(a) and 26 C.F.R. § 1031(k)-1(f) and (g).  In the alternative, LES meets the definition of broker under Virginia statutory law, with commensurate statutory duties, because as a part of its business model, LES offered for valuable consideration to buy, sell or exchange real estate and did buy, sell and participate in exchanges of real estate.

108.    LES was at all times subject to the terms and provisions and standards of § 54.1-2100 *et seq.* Va. Code Ann.   LES was not subject to any of the exemption set forth in § 54.1-2103 Va. Code Ann.

109.    Section 54.1-2108 prohibited LES from diverting or misusing the Exchange Funds deposited by the Exchangers during the course of the Exchange transactions.  Using Exchange

Funds to purchase ARS to increase profitability for LES violated § 54.1-2108.  Using Exchange

Funds to pay obligations to others, the prior Exchangers, violated § 54.1-2108.

110.     Section 54.1-2131 also required that LES disclose all material facts regarding the

transaction. LES's operation of its exchange business at a deficit, diversion of new client's Funds

to pay for older client's replacement properties, failure to maintain Funds in FDIC-insured

accounts, its operation of a Ponzi scheme and insolvency are all materials facts.

*Knowledge of SunTrust.*

111.     During the time frame relevant to this Complaint, between February 2008 and

November 26, 2008, SunTrust knew (i) that LES was a QI; (ii) QIs operate as fiduciaries to their

Exchange clients; (iii) that LES was to hold other people's money in trust for up to 180 days but no

longer; (iv) that the identity of LES's existing clients changed daily and there was a complete

turnover every 180 days; (v) that the Plaintiffs' money was deposited at SunTrust to be held by

LES as an agent and fiduciary pursuant to Exchange Agreements it was privy to (vi) that the terms

of the Exchange Agreements included the provision that Exchange Funds were not FDIC protected

**over** the FDIC limit; (vii) that the Exchange Funds were not held by LES in FDIC protected

accounts; (viii) that LES and all affiliated members of the Federation of Exchange Accommodators

(FEA) are subject to the requirement that they act as fiduciaries in Exchange transactions; (ix) that

LES acknowledged its fiduciary capacity in the Exchange transactions; (x) that LES acknowledged

that its role was to hold the Exchange Funds in escrow; (xi) that LES acknowledged that the

Exchange Funds were the property of the Exchangers; (xii) that LES was commingling the

Exchange Funds in the SunTrust 3318 account; (xiii) that LES was using the SunTrust 3318

account as an operating account; (xiv) that LES was misappropriating the Exchange Funds in the

SunTrust 3318 account to pay prior commitments on older Exchange transactions; (xv) that LES

was not maintaining the availability of Exchange Funds for purchase of replacement properties of new Exchangers whose Funds were cycling into the SunTrust 3318 account; (xvi) that LES was operating with a significant Exchange Fund deficit; (xvii) that LES held $290 million in unmarketable ARS that could not be used to fulfill LES's Exchange Transaction commitments; (xviii) that LES had severe liquidity problems that threatened its continued viability; and (xix) that LES was operating a Ponzi scheme.

112.    SunTrust thus had knowledge that LES was a fiduciary breaching its fiduciary duties.    However, SunTrust knew that the repayment of the $100 million debt owed to it by LFG would be in jeopardy if LES failed to fund even one escrow for the purchase of replacement property so it continued to assist LES in running a 1031 Ponzi scheme by defrauding new Exchangers out of their money.

*The Individual Defendants' Participation in Bad Acts.*

*-- Defendants Ramos and Jones*

113.    At all times relevant to this Complaint, Defendant Ronald Ramos served as Vice President and Treasurer of LES as well as Senior Vice President and Treasurer of LFG.  His functions were oversight of cash management and investment management, as well as involvement with establishing investment guidelines, which drove acceptable investments.  During the 2008 time frame Ramos reported directly to Defendant Evans, who directed his day-to-day activities.

114.    Defendant Devon Jones served as Vice President and Assistant Treasurer with LES and LFG.  Jones was responsible for LES's cash management process, handling the daily cash operations and the administration of the bank accounts.  At all times she reported directly to Defendant Ramos.

115.    A part of Defendant Ramos's responsibilities as Treasurer of LES was to oversee all of the Funds that LES was holding for its Exchange clients.  He had full authority to direct the SunTrust 3318 account where the Exchange Funds of Plaintiffs and others similarly situated were deposited by LES.

116.    Ramos and Jones did not have in place any written internal controls regarding the SunTrust 3318 account.  They allowed LES to use the account as an operating account, commingling fees due to LES with Exchange Funds.

117.    Ramos was a member of the LES's Investment Funds Committee and signed the minutes as Secretary.  Jones attended the meetings.

118.    Ramos and Jones made the decision to invest the Exchange Funds in ARS.  The decision was made so that LES could earn additional income and be paid more interest.

119.    Following the February 2008 market freeze on ARS, Ramos had regular conversations with SunTrust, as did Defendant Jones.  These conversations involved seeking a solution from SunTrust for LES's liquidity problems.

120.    Following the February 2008 market freeze on ARS, Jones began preparing a weekly chart of outflows and potential inflows to set up best-case and worst-case scenarios on liquidity.  These charts were essentially a roadmap for operation of the Ponzi scheme.  These charts also warned when and whether LES would run out of funds if it were not able to secure sufficient uninformed Exchangers to keep the money flowing.  Defendants Ramos and Evans were privy to these charts.

121.    Defendants Jones and Ramos both participated in the preparation of disclosure language for the LFG's quarterly reports, the 10-Qs, to the SEC, including the specific language used in the March, June and September quarterly reports that "like-kind exchanges not held at

Centennial **are not considered our assets** and are not included in the accompanying consolidated balance sheets." [Emphasis added].

122. Throughout 2008, LES's Treasury Department, through Ramos and Jones, encouraged LES employees to use commingled exchange agreements whenever possible and to set up the products accordingly.

123. In August of 2009, Defendants Ramos and Jones participated in on-going discussion with Defendants Evans and Chandler regarding LES's lack of liquidity. The substance of these discussions was LES's depletion of cash.

124. In early September 2008, Ramos signed an agreement not to disclose information in connection with his responsibilities at LFG, which would have included the information concerning ARS and illiquidity.

125. In early October 2008, Defendant Ramos became aware there was a reasonable potential that LES would have to cease operating

126. On October 1, 2008, Ramos and Jones participated in an LFG Investment Funds Committee meeting. Ramos, as Secretary prepared minutes of the meeting, noting that LES was appealing to be a part of the SunTrust ARS settlement, "since the company is **acting in a fiduciary capacity**, with the funds ultimately belonging to the retail client." [Emphasis added].

127. Ramos was copied on and did not seek to correct the correspondence of Peter Kolbe LFG Senior Vice President for Governmental Affairs stating "the Exchange Company engages in a specialized form of escrow," and "the essential function of a Qualified Intermediary is to hold in escrow the proceeds."

128. On October 18, 2008, Ramos was involved in extensive discussions with Defendants Evans, Chandler, Conner, Allen and corporate counsel Michelle Gluck, regarding a

prior directive that would have stopped Exchange Funds from flowing into the commingled SunTrust 3318 account. They made the decision to rescind that directive and to continue to encourage prospective exchangers to sign up for commingled exchanges. In making this decision Ramos knew that unless liquidity returned to the ARS market, the cash in the commingled 3318 account would not be sufficient to meet all the obligations of LES per the exchange agreements. It was his belief that going forward on the directive not to open any more commingled accounts, combined with other factors, would put LES in a position where it would be out of cash within two weeks. Ramos was aware that continued operation of the Ponzi scheme required an influx of new Exchange Funds into the SunTrust 3318 account.

129.     Part of the October 18, 2008 discussion was the manner in which LES should respond to due-diligence inquiries. The decision made by the Individual Defendants was that LES would continue to do business as usual.

130.     On October 18, 2008, Ramos reviewed, but did not correct correspondence sent by Defendant Chandler dated October 20, 2008 to Treasury Secretary Paulson stating: "These suddenly unmarketable securities . . . are **held by LandAmerica as a fiduciary** to facilitate IRS Sec. 1031 real estate transactions made mostly by small businesses and individuals." [Emphasis added].

131.     Ramos never advised or contemplated advising marketing or sales personnel that they should inform exchangers that there were occasions when their incoming monies would be used to satisfy obligations owed to older exchangers.

132.     On two occasions in the third quarter of 2008 and one to two occasions in the fourth quarter there were insufficient Exchange Funds in the SunTrust 3318 account to fund operating expenses, dividends, and Exchange transactions, even by expending all new Exchange clients'

incoming Funds.  Rather than accept the insolvency and advise prospective Exchange clients of this highly material state of affairs, Ramos, with Defendant Evans made the decision to transfer the funds from LFG as "lulling" payments to keep the fact of insolvency and imminent failure secret from prospective Exchange clients whose Funds were needed to keep LES going in the short term.

133.    By mid-November 2008, Ramos was aware of the potential for an LES bankruptcy but no changes were made to LES's business as usual Ponzi scheme.

            *-- Defendant Evans*

134.    At all pertinent times Defendant William Evans served on the Board of Directors of LES and at some point in 2008, was an Officer of LES.  He also served as Executive Vice President and Chief Financial Officer of LFG.  Evans was responsible for the integrity of all financial information underlying LandAmerica's balance sheet and was the primary spokesperson on all financial matters necessary to meet public financial reporting needs mandated by the SEC. He was responsible as well for budgeting, business planning, performance, and improving profitability.

135.    Evans directed the day-to-day activities of LES Treasurer Ronald Ramos.

136.    Evans was informed of the "freeze" on LES's ARS investments in February of 2008, and kept posted on the status of LES's investments.  Thereafter, he was privy to the weekly charts prepared by Defendant Jones, showing when and whether LES would run out of funds if it did not secure sufficient uninformed Exchangers to keep the money flowing. Evans was privy to an Executive Summary as of October 2008 showing a projected cash shortfall at LES unless there was an increase in new Exchangers to fund older exchange commitments.

137.    Evans was involved in on-going discussions concerning liquidity problems at LES at least by August of 2008.

138.    Evans participated in the decision in the third and fourth quarters of 2008 to have LFG transfer funds to LES to make "lulling" payments to close exchanges when LES did not have sufficient funds even using new Exchangers' money.   The lulling payments fraudulently concealed LES's illiquidity from new exchangers, including the Plaintiffs, who entered into new Exchange Agreements with LES.

139.    Evans was copied on and did not seek to correct the correspondence of Peter Kolbe LFG Senior Vice President for Governmental Affairs stating "the Exchange Company engages in a specialized form of escrow," and that "the essential function of a Qualified Intermediary is to hold in escrow the proceeds."

140.    In October of 2008, Evans participated in the discussions regarding the prior directive that would have stopped commingling of incoming Exchange Funds and authorized the rescission of that directive.  He was a part of the discussion involving the fact that the cash in the commingled 3318 account would not be sufficient to meet the obligations of LES per the exchange agreements absent an influx of new Exchange Funds.

141.    Evans along with Defendants Ramos, Conner, Allen and Chandler, made the decision that LES would continue to do business as usual.

142.    Evans never advised marketing and sales personnel that they should inform exchangers that there were occasions when their incoming monies would be used to satisfy obligations owed to older exchangers.

*-- Defendant Conner*

143.    At all times relevant to this action, Defendant Steven Conner was Senior Vice President of LES and LFG.  Conner was responsible for the day-to-day running of LES.

36

144.    Defendant Conner's duties with LES were to manage growth, profitability, and servicing capabilities of LES.  Part of his duty was the presentation of the company to the public, design of marketing content, and messaging.

145.    Defendant Conner was responsible for approving all LES's marketing materials, as well as website content.

146.    In October of 2008 Defendant Conner instructed his employees to remove from the LES website references to LES's financial stability, acknowledging that the materials were outdated because they referred to ratings by ratings agencies and amounts of reserves by underwriters and that all those numbers had changed and were no longer accurate.

147    Defendant Conner did not, however, recall any hard copy marketing materials located in LES field offices.

148.    In the wake of the highly publicized failure of several QIs around the country LES disseminated an Internet advertisement, also reduced to the form of a hard copy brochure sent to its field offices entitled "The Financial Stability of LandAmerica."  This is the brochure that referenced "Funds Held in Trust" followed by the statement: "escrow and 1031 Exchange customers entrusted more than $3.2 billion to LandAmerica as of December 31, 2007."

149.    In this same Internet ad LES represented that "in connection with each IRC § 1031 exchange involving LandAmerica 1031 Exchange Services, LandAmerica provides its clients with a signed, written guaranty of the availability of the full amount of exchange funds received under the Exchange Agreement."  Defendant Conner knew this representation was false but approved it anyway.  Neither LES nor LFG provided such a written guaranty unless a specific request was made nor could it truthfully make such a guaranty to a "commingled" exchanger since at any given point in time from March 2008 forward its SunTrust 3318 account was operated at a deficit.

150.    Defendant Conner approved the brochure but has since denied that the reference to "Funds Held in Trust" meant that LES held funds in trust.

151.    In October 2008, Conner learned that the ARS had created a liquidity crisis for LES.  Instead of altering the fraudulent way LES was conducting business *vis-a-vis* Exchangers, Conner signed a non-disclosure agreement with LFG to keep quiet about the ARS and the liquidity crisis.

*-- Defendant Allen*

152.    Defendant Brenton J. Allen, at all relevant times, was Vice President and National Underwriting Counsel of LES and Assistant Secretary of LFG.   He answered to and reported to Steve Connor.

153.    As a part of his job at LES, Allen routinely reviewed LES advertising materials.  He was responsible for editing and approving LES promotional materials.

154.    Allen, who holds J.D. and L.L.M. degrees, currently views the reference to "trust" in LES promotional materials he reviewed and approved as having been included because "it's advertising," and simply meaning "entrusted," not "in trust."

155.    LES promotional materials edited and approved by Allen were disseminated by LES at trade shows, to real estate brokers, attorneys and developers of real estate, through direct mailings to potential customers, by email and by hard copy mail.

156.    On October 18, 2008, Allen participated in the extensive discussions involving Defendants Evans, Chandler, Ramos, Conner, and corporate counsel Michelle Gluck to revisit the use of commingled exchanges to recharge the SunTrust 3318 account.  He was a part of the decision going forward to promote and encourage commingled exchanges to raise cash to keep the

Ponzi scheme going.  The discussions also involved whether there were changes that could be made to make the exchange documents more advantageous to LES.

157.     Allen considers certain LES advertising material he approved to be incorrect.  He believes that LFG did not and could not provide to each exchanger a 100% written guaranty as promised in LES brochures.

158.     Allen received a copy of Peter Kolbe's letter to the Nebraska Department of Insurance referencing LES's role as engaging in a specialized form of escrow.  He received a copy of Michelle Gluck's letter to SunTrust and Citibank referencing LES's role of holding "these funds in escrow as a fiduciary."   Allen maintains that both Gluck, the highest-ranking legal officer at LFG, and Kolbe, a Senior Vice President and Government Affairs Counsel, were wrong.

159.     Allen played a role in drafting the language of the Exchange Agreements. The Agreements contained language providing that LES had "sole and exclusive possession, dominion, control and use of all Exchange Funds" (the "Sole Possession Language").  This language was included to satisfy the IRC requirement that the Exchanger not receive the sale proceeds and for no other purpose. The language did not alter the essence of the bargain set forth in the Exchange Agreement whereby each client promised to pay LES roughly $1,000 as consideration for LES's promise to "hold" the client's Exchange Funds in an FDIC-insured account at SunTrust Bank until the client directed LES to fund the client's replacement property escrow.

160.     LES knew of its clients' interpretation of the Sole Possession Language, but unbeknownst to its clients, LES assigned a very different meaning.  LES maintained the Sole Possession Language meant the Exchange Funds (often the clients' life savings) "belonged" to LES and that LES could use the money as it pleased, including paying LES's payroll, rent, gambling in Las Vegas, or, as LES actually did, funneling the money into an illegal Ponzi scheme.

161.     Allen was aware that high-ranking LES and LFG officials, such as Michelle Gluck and Peter Kolbe, viewed LES's role as a fiduciary holding funds in escrow so certainly LES clients would think so.  This conclusion is mandated because, (i) any other interpretation conflicted with the rest of the contract terms LES drafted, and (ii) no one would ever knowingly "give" their life savings to LES to lose in a Ponzi scheme, or otherwise.

162.     Neither Allen  nor anyone else at LES did anything to correct the Exchange Clients' understanding because if he had, no one would have hired LES, the Ponzi scheme would have been exposed, and LES would have collapsed immediately (sooner than it did).

163.     Instead Allen, like Conner and Ramos, submitted to a non-disclosure agreement so that LES's clients would continue entrusting their life savings to a company, touted at the bottom of its company emails as "A Fortune 2007 Most Admired Company," which absent a miracle was careening toward bankruptcy and taking those clients' life savings with it.

        *-- Defendant Chandler*

164.     Defendant Theodore L. Chandler, Jr. was Chairman of the Board of Directors and Chief Executive Officer of LFG, the corporate parent of LES.

165.     Throughout 2008 Chandler was kept in the loop concerning LES's liquidity problems.  In August 2008, Chandler was a part of on-going discussions with Jones, Ramos, Evans, and Chandler concerning LES's lack of liquidity and that it was running out of cash.

166.     On October 18, 2008, Chandler participated in the decision to rescind the "segregated account" directive that would have effectively halted the Ponzi scheme but also would have sealed LES's financial fate.  Instead that decision sealed the fate of the Exchangers lured into commingled Exchange transactions thereafter.

167.    That same weekend Chandler was involved in drafting a letter to Treasury Secretary Henry Paulson seeking liquidity assistance.  This letter, which referred to LES "as a fiduciary to facilitate IRS Section 1031 real estate transactions," requested immediate financial assistance from the federal government and referenced the potential for "a disastrous chain reaction."

## V.    CLASS ACTION ALLEGATIONS

168.    Plaintiffs bring suit on behalf of themselves and all others similarly situated, under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to the claims alleged herein.

169.    The proposed Class is defined as follows:

> Each and every person whose 1031 Exchange Funds were deposited by LandAmerica 1031 Exchange Services, Inc. with SunTrust Bank and who have been denied their rights in and access to those Exchange Funds.

170.    Upon completion of discovery with respect to the scope of the class, Plaintiffs reserve the right to amend the class definition and to define sub-classes if needed.

171.    The members of the class as so numerous that joinder of all of them is impracticable.  There are questions of law and fact that are common to all members of the Class that predominate over any questions affecting any individual class member.  The common questions include, but are not limited to:

a.    The nature and extent of fiduciary duties owed by LES to the Plaintiffs and its Exchange clients arising by contract, statute and common law;

b.    Whether LES operated a Ponzi scheme after the collapse of the ARS market on February 13, 2008 by soliciting new clients to deposit their Exchange Funds at SunTrust Bank and using the Funds to pay prior customers;

c.    Whether SunTrust knowingly assisted LES in operating a Ponzi scheme by accepting the deposit of Plaintiffs' Exchange Funds and transferring those same funds to close escrows for non-Plaintiff clients of LES while a deficit existed in furtherance of its own financial interests;

d.   The nature and extent of intangible property interests created by the Exchange Agreements and the extent of beneficial interest in the Exchange Funds retained by LES's Exchange Fund clients during the term of the Exchange Agreements with LES;

e.   Knowledge of SunTrust regarding the Exchange transactions, LES's role as a qualified intermediary under 26 U.S.C. § 1031 and LES's breach of fiduciary duties with regard to the deposits with SunTrust at issue;

f.   Nature of the encouragement, assistance and participation by SunTrust in LES's wrongdoing;

g.   Whether SunTrust converted and/or knowingly assisted LES in converting the intangible property interests and Exchange Funds of Plaintiffs and other similarly situated Exchangers;

h.   Nature and extent of SunTrust's actions in conspiring with agents and representatives of LES and engaging in concerted action for the purpose of misusing the Exchange Funds of Plaintiffs and others similarly situated in derogation of their beneficial property rights in the Funds;

i.   Whether Defendants Chandler, Conner, Evans, Ramos, Jones and Allen, by their conduct, breached fiduciary duties owed to Plaintiffs and others similarly situated;

j.   Whether Defendants Chandler, Conner, Evans, Ramos, Jones and Allen, were negligent with regard to the Exchange transactions and the Exchange Funds of Plaintiffs and others similarly situated;

k.   Whether the failure to disclose material facts by Defendants Chandler, Conner, Evans, Ramos, Jones and Allen was fraud and fraudulent concealment;

l.   Whether the failure to disclose material facts by Defendants Chandler, Conner, Evans, Ramos, Jones and Allen was constructive fraud;

m.   Extent of the loss to Plaintiffs and others similarly situated by virtue of the wrongful conduct of Defendants; and

n.   Entitlement to punitive damages.

172.   Plaintiffs' claims are typical of the claims of class members. Plaintiffs are members of the class and have suffered harm and are likely to continue to suffer harm due to the loss of the Exchange Funds.

173.    Plaintiffs will fully, fairly and adequately protect the interests of the members of the Class.  Plaintiffs' interests are consistent with and not antagonistic to the interests of the Class.  Combined, the representative Plaintiffs have lost over $2.1 million and have sought out and retained counsel experienced in complex Class Actions, commercial litigation, and 1031 Exchanges in an effort to get their money back.  Plaintiffs have agreed to act for the benefit of all of the victims similarly situated and not to put their individual interests ahead of any member of the Class.

174.    The prosecution of a multitude of separate actions by individual Class members may establish incompatible standards of conduct for the parties opposing the Class, may substantially impair or impede the interests of other members of the Class to protect their interests, and will result in waste.

175.    The actions of Defendants applicable to the Plaintiffs apply generally to the Class thereby making the final relief granted by the Court to the Plaintiffs applicable to the Class as a whole.

176.    This Class Action would be superior to other available methods for the fair and efficient adjudication of the controversy between the parties.  Concentrating litigation in this forum will also promote judicial efficiency.

177.    This proposed Class Action is manageable.  There are approximately 400 victims with relatively large claims compared to most Class Actions involving a multitude of claimants with minimal claims.  Participation in the case by Class members who do not opt out will be assured by the size of the loss sustained by each member.

178.    The Class meets the requirements of and should be certified under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

## FOR A FIRST CAUSE OF ACTION
### (Aiding and Abetting LES's Breach of Fiduciary Duty)
### (Defendant SunTrust)

179.     The Plaintiffs reallege and reiterate all of the allegations contained in paragraphs 1 through 178 as fully as if repeated herein verbatim.

180.     At all relevant times LES was acting as agent and/or broker for Plaintiffs and other similarly situated Exchangers, for all purposes, other than the statutory "actual or constructive receipt" analysis of 26 U.S.C. § 1031.  An agent is a fiduciary for all matters within the scope of the agency.

181.     At all relevant times LES owed contractual, common law and statutory fiduciary duties to Plaintiffs and other similarly situated exchangers, to safeguard the Exchange Funds, to maintain the Exchange Funds in trust, and to use those Exchange Funds solely in a manner consistent with the Exchange Agreements.  First and foremost, LES had the obligation to make sure that each Plaintiff's Exchange Funds were available for each Plaintiff when they needed to timely fund the purchase of replacement property.

182.     LES breached its fiduciary duties when it (1) continued to operate after February 13, 2008, using Plaintiffs' Exchange Funds to fund the escrows of earlier 1031 Exchange clients whose Funds were lost due to LES's imprudent investment in ARS; (2) commingled Exchange Funds with its own funds in its operating account; and (3) misused and diverted the Exchange Funds for its own purposes; and (4) operated with a trust deficit that nothing short of a miracle could have resolved.

183.     SunTrust knew after February 13, 2008 that LES was "out of trust" and was therefore operating a Ponzi scheme by using new clients' Exchange Funds to fund old exchanges at LES.

44

184.    SunTrust knew (i) LES was a QI; (ii) QIs operate as fiduciaries to their Exchange clients; (iii) LES was to hold other people's money in trust for up to 180 days but no longer; (iv) that the identity of LES's existing clients changed daily and there was a complete turnover every 180 days; (v) that the Plaintiffs' money was deposited at SunTrust to be held by LES as an agent and fiduciary pursuant to Exchange Agreements it was privy to; (vi) the terms of the Exchange Agreements, including the provision that Exchange Funds were not FDIC protected **over** the FDIC limit; (vii) that the Exchange Funds were not held by LES in FDIC-protected accounts that would provide each Exchanger protection up to the FDIC limit; (viii) that LES and all affiliated members of the Federation of Exchange Accommodators are subject to the requirement that they act as fiduciaries in Exchange transactions; (ix) that LES had acknowledged its fiduciary capacity in the Exchange transactions; (x) that LES had acknowledged that its role was to hold the Exchange Funds in escrow; (xi) that LES had acknowledged that the Exchange Funds were the property of the Exchangers; (xii) that LES was commingling the Exchange Funds in the SunTrust 3318 account; (xiii) that LES was using the SunTrust 3318 account as an operating account; (xiv) that LES was misappropriating the Exchange Funds in the SunTrust 3318 account to pay prior commitments on older Exchange Transactions; (xv) that LES was not maintaining the availability of Exchange Funds for purchase of replacement properties of new Exchangers whose Funds were cycling into the SunTrust 3318 account; (xvi) that LES was operating with a significant Exchange Fund deficit; (xvii) that LES held $290 million in unmarketable ARS that could not be used to fulfill LES's Exchange Transaction commitments; (xviii) that LES had severe liquidity problems that threatened its continued viability; and (xix) that LES was operating a Ponzi scheme.

185.    SunTrust had knowledge of LES's breach of fiduciary duties.

186.    Notwithstanding this knowledge, SunTrust actively continued to encourage and assist LES in breaching its fiduciary duties by accepting the deposits of Plaintiffs' Exchange Funds and physically transferring these Funds in breach of trust to pay older exchanges for the purpose of artificially prolonging LES's existence in order for LFG to repay SunTrust the $100 million it owed.

187.    SunTrust also knew that LES's failure to close even one escrow would destroy LES's business reputation and would have a significant economic impact on LFG, the parent of LES and a significant debtor of SunTrust.  SunTrust encouraged LES to continue the Ponzi scheme by holding out the possibility that it would redeem the ARS and continued to assist LES in this fraud.  SunTrust's actions in encouraging and assisting LES in its breach of the fiduciary duties owed to Plaintiffs and other similarly situated Exchangers, was motivated by SunTrust's desire for economic advantage and gain, and in particular, the repayment of the $100 million owed to SunTrust by LFG.

188.    In aiding and abetting the breaches of fiduciary duties of LES as alleged above, it was foreseeable to SunTrust that Plaintiffs and the members of the class would suffer damages in the manner they were damaged.

189.    As the direct and proximate result of the aforementioned breaches of fiduciary duties by LES, which were aided, abetted, assisted and encouraged by SunTrust, the Plaintiffs and others similarly situated have been harmed by the loss of their Exchange Funds (over $191,000,000) and have incurred additional damages as a proximate and foreseeable result, including but not limited to: (i) lost interest; (ii) adverse tax consequences; (iii) professional fees incurred in mitigating adverse tax consequences; (iv) lost deposits on the purchase of replacement property; and/or (v) litigation expenses associated with contract disputes with the sellers of

replacement property; for which the Plaintiffs and others similarly situated are entitled to an award

of actual damages in an amount to be determined by the jury at the trial of this case.  The conduct

of SunTrust in aiding and abetting LES's breaches of fiduciary duties owed to the Plaintiffs and to

other similarly situated Exchangers was intentional, willful, malicious, and oppressive, by virtue of

which Plaintiffs are entitled to an award of punitive damages.

### FOR A SECOND CAUSE OF ACTION
**(Conversion and Aiding and Abetting Conversion of Trust Funds)**
**(Defendant SunTrust)**

190.    Plaintiffs incorporate the allegations of paragraphs 1 through 189 as though fully set

forth herein.

191.    Conversion is the intentional and wrongful exercise of dominion over personal

property of another, including substantial interference with possession or the right to possession.

The unauthorized use of property of another is substantial interference.  Conversion also includes

interference with intangible property rights that are merged with a document.

192.    Pursuant to the Exchange Agreements signed by both LES and the Plaintiffs, the

Plaintiffs and other similarly situated Exchangers had intangible property rights merged within the

agreement, including but not limited to:  (1) in replacement property to be purchased from their

Exchange Funds; (2) in the unconditional guaranty of the full and immediate availability of their

Exchange Funds for the purposes specified in the Exchange Agreement; and (3) in the tax benefits

to be realized pursuant to LES's facilitation of the IRS Section 1031 exchange.  Plaintiffs and the

other similarly situated Exchangers also retained the beneficial interest in and to the Exchange

Funds subject to the time-limited restrictions on actual and constructive receipt embodied within

the Exchange Agreements in compliance with 26 U.S.C. § 1031.  By passage of time and operation

of law, Plaintiffs' beneficial interest in the Exchange Funds has ripened into a full legal interest.

47

193.    SunTrust converted and aided and abetted LES's conversion by using Plaintiffs' Exchange Funds for unauthorized purposes and destroying Plaintiffs' intangible property rights as set forth herein.

194.    Neither Plaintiffs nor any member of the Class consented to the misappropriation and conversion of their Exchange Funds.  The unauthorized use and conversion of the Exchange Funds effectively prevented the Plaintiffs' exercise of their intangible rights and such conduct directly and proximately resulted in the loss of Plaintiffs' rights to replacement property, the monetary loss associated with disqualification of the IRC § 1031 exchange, and the loss of Plaintiffs' Exchange Funds; for which the Plaintiffs and others similarly situated are entitled to an award of actual and punitive damages in an amount to be determined by the jury at the trial of this case.

### FOR A THIRD CAUSE OF ACTION
### (Common Law Civil Conspiracy)
### (Defendant SunTrust)

195.    Plaintiffs incorporate the allegations of paragraphs 1 through 194 as though fully set forth herein.

196.    During the time period from February 2008 to November 24, 2008 various agents or representatives of SunTrust conspired with agents and representatives of LES, including but not limited to Defendants Ramos and Jones, and engaged in concerted action for the united purpose of (1) misusing, diverting and converting the Exchange Funds and the intangible property rights created by the Exchange Agreements, in derogation to the property rights of the Plaintiffs and other similarly situated Exchangers; (2) operating an unlawful Ponzi scheme; and (3) defrauding the Exchangers out of their Exchange Funds.

197.    LES required the assistance of a third party such as SunTrust to carry out its plan and to operate the unlawful Ponzi scheme and SunTrust provided that assistance as set forth herein.

198.    As the direct and proximate result of the unlawful combination and SunTrust's acts in furtherance of the unlawful combination, the Plaintiffs and others similarly situated have been harmed by the loss of their Exchange Funds (over $191,000,000) and have incurred additional damages as a proximate and foreseeable result, including but not limited to: (i) lost interest; (ii) adverse tax consequences; (iii) professional fees incurred in mitigating adverse tax consequences; (iv) lost deposits on the purchase of replacement property; and/or (v) litigation expenses associated with contract disputes with the sellers of replacement property; for which the Plaintiffs and others similarly situated are entitled to an award of actual and punitive damages in an amount to be determined by the jury at the trial of this case.

**FOR A FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty)**
**(Individual Defendants)**

199.    Plaintiffs incorporate the allegations of paragraphs 1 through 198 as though fully set forth herein.

200.    Defendants Chandler, Conner, Evans, Ramos, Jones and Allen were officers of LES and/or officers of LFG directly controlling the actions of LES, while LES was acting as a defalcating corporate trustee.  The Individual Defendants on their own behalf, by virtue of their agency and employment with LES, owed fiduciary duties to the Plaintiffs and other similarly situated Exchangers.

201.    Chandler, Conner, Evans, Ramos, Jones and Allen committed the wrongful acts set forth above and in doing so breached their fiduciary duties owed to Plaintiffs and others similarly

situated, including but not limited to: (i) the unauthorized and tortious use of Plaintiffs' Exchange Funds; (ii) misrepresenting to and/or concealing from Plaintiffs what LES intended to do with their Exchange Funds; (iii) concealing the fact that Plaintiffs' Exchange Funds were at risk because LES was operating a Ponzi scheme; (iv) concealing the fact that Plaintiffs' Exchange Funds were at risk because LES was insolvent; (v) converting Plaintiffs' Exchange Funds; and (vi) embezzling Plaintiffs' Exchange Funds by obtaining said Funds under false pretenses with the intent to use in a manner or purpose other than that for which they were entrusted; (vii) commingling Plaintiffs' Exchange Funds with LES's operating Funds; and (viii) operating without at all times holding funds sufficient to meet its obligations under outstanding Exchange Agreements.

202.    In addition, Defendants Chandler, Conner, Evans, Ramos, Jones and Allen concealed material facts concerning the Exchange transactions, including but not limited to the following: (i) that Exchange Funds were not deposited in accounts that would protect Exchangers up to FDIC insured limits; (ii) that LES was operating "out of trust" as a defalcating trustee; (iii) that LES was not holding Exchange Funds for the purchase of Exchangers' replacement property; (iv) that LES did not consider itself a fiduciary; (v) that LES did not consider the Exchange Funds trust or escrow funds; (vi) that LES believed it had the unfettered rights to use Exchange Funds in any manner, including making payroll, rent, or gambling in Las Vegas; (vii) that LES was operating a Ponzi scheme; (viii) that LES was insolvent; (ix) that absent a miracle LES was doomed to go broke; (x) that LES as operating in violation of 26 C.F.R. §468(b)-6.

203.    As the direct and proximate result of the aforementioned breaches of fiduciary duties by the Individual Defendants, the Plaintiffs and others similarly situated have been harmed by the loss of their Exchange Funds (over $191,000,000) and have incurred additional damages as a proximate and foreseeable result, including but not limited to: (i) lost interest; (ii) adverse tax

consequences; (iii) professional fees incurred in mitigating adverse tax consequences; (iv) lost

deposits on the purchase of replacement property; and/or (v) litigation expenses associated with

contract disputes with the sellers of replacement property; for which the Plaintiffs and others

similarly situated are entitled to an award of actual damages in an amount to be determined by the

jury at the trial of this case. The conduct was intentional, willful, malicious, and oppressive, by

virtue of which Plaintiffs pray for an award of punitive damages.

**FOR A FIFTH CAUSE OF ACTION**
**(Negligence)**
**(Individual Defendants)**

204.    Plaintiffs incorporate the allegations of paragraphs 1 through 203 as though fully set

forth herein.

205.    Defendants Chandler, Conner, Evans, Ramos, Jones and Allen were negligent,

willful, wanton, reckless and grossly negligent (i) in handling, managing and accounting for

Plaintiffs' Exchange Funds; (ii) in drafting, formulating, editing, and dissemination of LES's

marketing materials touting that Exchange Funds at LES were "held in trust;" (iii) in failing to

establish written internal controls over the commingled Exchange Fund account; (iv) in

commingling Exchange Funds with LES operating Funds; (v) in soliciting new Exchange Funds to

operate a Ponzi scheme when they knew or should have known that, absent a miracle, LES would

fail in meeting its obligations and the Exchanger's money would be lost; (vi) in publicly promoting

LES as a fiduciary holding Funds for the benefit of Exchangers and privately acting as anything

but; (vii) in securing "lulling" payments from LFG to keep new Exchange clients coming through

the door; (vii) in responding to due diligence by Exchange clients, that it was business as usual;

(viii) in touting a full written guaranty of payment by LFG on each Exchange transaction that did

not exist.

206.     As the direct and proximate result of the negligence, willfulness, wantonness, recklessness and gross negligence of the Individual Defendants, as aforesaid, the Plaintiffs and others similarly situated have been harmed by the loss of their Exchange Funds (over $191,000,000) and have incurred additional damages as a proximate and foreseeable result, including but not limited to: (i) lost interest; (ii) adverse tax consequences; (iii) professional fees incurred in mitigating adverse tax consequences; (iv) lost deposits on the purchase of replacement property; and/or (v) litigation expenses associated with contract disputes with the sellers of replacement property; for which the Plaintiffs and others similarly situated are entitled to an award of actual and punitive damages in an amount to be determined by the jury at the trial of this case.

### FOR A SIXTH CAUSE OF ACTION
### (Fraud and Fraudulent Concealment)
### (Individual Defendants)

207.     Plaintiffs incorporate the allegations of paragraphs 1 through 206 as though fully set forth herein.

208.     Defendants Ramos, Allen, Ramos, Conner, Jones and Chandler had actual knowledge of material adverse facts that any and all potential Exchange clients would irrefutably consider material to an Exchange transaction, including but not limited to: (i) the dire financial status of LES based on the failure of the ARS market; (ii) that LES did not believe it held Funds for the benefit of Exchangers, as a fiduciary; (iii) that LES did not consider itself governed by its own pronouncements of fiduciary status in LES marketing materials and SEC filings; (iv)  that Exchange Funds were not protected by FDIC insurance up to the FDIC limit as Exchangers were led to believe, in direct violation of 12 U.S.C. § 1828 and 18 U.S.C. § 709; (v) that Exchange Funds were not held by LES for the purchase of replacement property and in fact were not held at

all but were spent to take care of LES's prior obligations; and (vi) that LES was operating a Ponzi scheme and applying their Funds to prior obligations.

209.    The Individual Defendants had statutory and common law duties to disclose to the Exchange Clients all material facts concerning the Exchange transactions.  Defendants intentionally breached this duty, with intent to deceive so that Exchange Clients continued to deposit Funds with LES.

210.    Based on the uniform, written nature of the fraud and concealment of material facts and the irrefutable materiality, reliance may be presumed.

211.    As the direct and proximate result of the fraud and fraudulent concealment of the Individual Defendants, as aforesaid, the Plaintiffs and others similarly situated have been harmed by the loss of their Exchange Funds (over $191,000,000) and have incurred additional damages as a proximate and foreseeable result, including but not limited to: (i) lost interest; (ii) adverse tax consequences; (iii) professional fees incurred in mitigating adverse tax consequences; (iv) lost deposits on the purchase of replacement property; and/or (v) litigation expenses associated with contract disputes with the sellers of replacement property; for which the Plaintiffs and others similarly situated are entitled to an award of actual and punitive damages in an amount to be determined by the jury at the trial of this case.

## FOR A SEVENTH CAUSE OF AC TION
### (Constructive Fraud)
### (Individual Defendants)

212.    Plaintiffs incorporate the allegations of paragraphs 1 through 211 as though fully set forth herein.

213.    Defendants Ramos, Allen, Ramos, Conner, Jones and Chandler had actual knowledge of material adverse facts that any and all potential Exchange clients would irrefutably

consider material to an Exchange transaction, including but not limited to: (i) the dire financial status of LES based on the failure of the ARS market; (ii) that LES did not believe it held Funds for the benefit of Exchangers, as a fiduciary; (iii) that LES did not consider itself governed by its own pronouncements of fiduciary status in LES marketing materials and SEC filings; (iv) that Exchange Funds were not protected by FDIC insurance up to the FDIC limit as Exchanger were led to believe; (v) that Exchange Funds were not held by LES for the purchase of replacement property and, in fact, were not held at all but were spent to take care of LES's prior obligations; (vi) that LES was operating a Ponzi scheme and applying their Funds to prior obligations.

214.    The Individual Defendants had statutory and common law duties to disclose to the Exchange Clients all material facts concerning the Exchange transactions.

215.    The misrepresentations and concealment by the Individual Defendants had a clear tendency to deceive others, to violate public or private confidence, and to injure public interests, and constitute constructive fraud.

216.    Based on the uniform, written nature of the fraud and concealment of material facts and the irrefutable materiality, reliance may be presumed.

217.    As the direct and proximate result of the constructive fraud of the Individual Defendants, as aforesaid, the Plaintiffs and others similarly situated have been harmed by the loss of their Exchange Funds (over $191,000,000) and have incurred additional damages as a proximate and foreseeable result, including but not limited to: (i) lost interest; (ii) adverse tax consequences; (iii) professional fees incurred in mitigating adverse tax consequences; (iv) lost deposits on the purchase of replacement property; and/or (v) litigation expenses associated with contract disputes with the sellers of replacement property; for which the Plaintiffs and others similarly situated are

entitled to an award of actual and punitive damages in an amount to be determined by the jury at the trial of this case.

WHEREFORE, Plaintiffs respectfully pray, on behalf of themselves and others similarly situated, for judgment as follows:

A.     For this Court's order certifying a class action pursuant to Rule 23(a) and (b)(3) F.R.Civ.P.;

B.     For actual and punitive damages;

C.     For pre-judgment interest as allowed by law;

D.     For the costs and disbursements of this action and

G.     For such other and further relief as this Court may deem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

s/ James R. Gilreath
James R. Gilreath, Fed. ID No. 2101
William M. Hogan, Fed. ID No. 6141
**THE GILREATH LAW FIRM, P.A.**
110 Lavinia Avenue (29601)
Post Office Box 2147
Greenville, South Carolina  29602
(864) 242-4727 Telephone
(864) 232-4395 Facsimile
jim@gilreatlaw.com
bhogan@gilreathlaw.com

Cheryl F. Perkins, Fed. ID No. 4969
Charles W. Whetstone, Jr., Fed. ID No. 4604
**WHETSTONE MYERS PERKINS & YOUNG LLC**
601 Devine Street (29201)
Post Office Box 8086
Columbia, South Carolina  29202
(803) 799-9400 Telephone
(803) 799-2017 Facsimile
cwhetstone@attorneyssc.com
cperkins@attorneyssc.com

Robert L. Brace, CBN. 122240
Michael P. Denver, CBN.199279
**HOLLISTER & BRACE**
P.O Box 630
Santa Barbara, California  93102
(805) 963-6711 Telephone
(805) 965-0329 Facsimile
rlbrace@hbsb.com
mpdenver@hbsb.com


Thomas Foley, CBN. 65812
Robert A. Curtis, CBN. 203870
**FOLEY, BEZEK, BEHLE & CURTIS, LLP**
15 W. Carrillo Street
Santa Barbara, California  93101
(805) 962-9495 Telephone
(805) 962-0722 Facsimile
tfoley@foleybezek.com
rcurtis@foleybezek.com


**ATTORNEYS FOR PLAINTIFFS, AND ALL
OTHERS SIMILARLY SITUATED**

August 3, 2009
Greenville, South Carolina