IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

|  |  |  |
|---|---|---|
| | ) | C/A No.: 8:09-2054-JFA |
| | ) | |
| In re § 1031 Exchange Litigation | ) | **ORDER** |
| | ) | |
| | ) | |

This case concerns an intermediary's use of funds originally on deposit at a bank and

the circumstances surrounding its alleged inability to return such funds due to its investment

in the now frozen auction-rate securities market. The matter is currently before the court on

the motion of defendant SunTrust Banks, Inc. ("SunTrust") to dismiss the claims of Gerald

Terry, Ann Robbins, Jane T. Evans, Angela M. Arthur, Vivian Hayes, Leapin Eagle LLC,

and Denise Wilson (collectively, the "Customers"). (Dkt. No. 64.) The motion has been

fully briefed and the court heard oral argument at a February 17, 2010 hearing, where the

court took the motion under advisement. This order serves to announce the ruling of the

court.

I.     Background

    A.     Factual History

    LandAmerica 1031 Exchange Services, Inc. ("LES") offered its services as a qualified

intermediary to individuals seeking to effect a tax deferred like-kind exchange under § 1031

of the Internal Revenue Code. 28 U.S.C. § 1031 (2006). For a flat fee of between $600 and

$1,000, and a $250 closing fee, LES would hold the proceeds (the "Exchange Funds") of a

real estate sale until such time as the customer identified and sought to close on a target

property. At closing, LES would transfer the Exchange Funds to the seller of the target property.[1] Through using LES as a qualified intermediary, a customer could avoid realizing a taxable gain on the sale of his property, as the customer avoids possession of the initial sale proceeds. When a § 1031 exchange is carried out correctly, any taxable gain is deferred until the target property is sold. A contract (the "Exchange Agreement") set forth the relationship and obligations between the parties.

The Customers allege that LES placed their Exchange Funds in LES's general operating account at a SunTrust bank located in Richmond, Virginia known as the 3318 Account. The Customers further allege that LES used Exchange Funds from the 3318 Account to purchase auction-rate securities ("ARS") through a SunTrust subsidiary. When the ARS market froze in February 2008, the Customers allege that LES held more than $200 million in ARS and that LES suffered substantial losses stemming from the illiquidity of its ARS holdings. Due to the illiquidity of the ARS after February 2008, the Customers allege that LES began to use Exchange Funds from new customers, such as the Customers, to complete exchanges for existing customers—effecting a Ponzi scheme.

On November 26, 2008, LES filed for bankruptcy, which had the effect of freezing all Exchange Funds and preventing the Customers and other § 1031 exchange participants from completing their transactions or from accessing their funds. The Customers' theory of

---

[1] Section 1031 requires a seller to identify like-kind property within forty five days from the date of the sale of the original investment property, and provides the seller 180 days to close on the purchase of replacement property. Failure to consummate the transaction within the allotted time results in loss of the § 1031 tax benefit. See 26 U.S.C. § 1031 (2006).

the case posits that LES should have ceased operations and distributed the remaining proceeds when the ARS market froze in February 2008. The Customers allege by continuing to solicit new clients after February 2008, including the Customers, and using their Exchange funds to complete exchanges for those customers whose money was tied up in illiquid ARS, LES breached its fiduciary duty to the Customers and converted their Exchange Funds.

SunTrust's involvement allegedly consisted of "substantially assist[ing] LES in converting the [Customers'] Exchange Funds in hopes of being repaid the $100 Million remaining on a $200 Million revolving line of credit SunTrust had originally loaned LES' parent, LandAmerica Financial Group, Inc. ("LFG"), in July of 2006." (Am. Compl. ¶ 3.) The Customers assert that SunTrust assisted in the "Ponzi scheme" with the aim of keeping LES in business long enough for the ARS market to thaw or for LFG to sell other liquid assets in order to repay funds owed SunTrust. (Id.) At bottom, the Customers allege that because a SunTrust subsidiary sold LES the ARS, and because LES deposited the Exchange Funds in SunTrust accounts, SunTrust necessarily knew about and participated in the alleged financial shenanigans.

Specifically, the Customers contend that SunTrust knew (1) that LES was a qualified intermediary; (2) qualified intermediaries act as fiduciaries; (3) that LES was to hold Exchange Funds up to 180 days, but no longer; (4) that the identity of LES's customers changed daily; (5) that the Customers' money was deposited at SunTrust to be held by LES as an agent and fiduciary pursuant to the Exchange Agreement; (6) that the terms of the

Exchange Agreement included a provision that Exchange Funds were not fully protected by the FDIC; (7) that Exchange Funds were not held in FDIC protected accounts; (8) that LES was affiliated with the Federation of Exchange Accommodators; (9) that LES acknowledged its fiduciary capacity in the transactions; (10) that LES acknowledged it held funds in escrow; (11) that LES acknowledged that the funds were the property of customers; (12) that LES commingled funds in the SunTrust 3318 account; (13) that SunTrust Account 3318 was an operating account; (14) that LES used new funds to complete transactions for existing customers; (15) that LES was not maintaining the availability of Exchange Funds; (16) that LES was operating with a significant Exchange Fund deficit; (17) that LES held $290 million in ARS that could not be used to complete transactions; (18) that LES's liquidity problems threatened its viability; and (19) that LES was operating a Ponzi scheme. (Am. Compl. ¶ 111.)

Based on the forgoing, the Customers assert four claims against SunTrust: (1) aiding and abetting LES's breach of fiduciary duty, (2) conversion, (3) aiding and abetting LES's conversion, and (4) civil conspiracy.

B.    Procedural Background

This case is the result of two cases, Terry v. Suntrust Banks, Inc., 8:09-415-JFA, and Arthur v. SunTrust Banks, Inc., 8:09-1739-JFA, being joined together in a single proceeding. Terry was filed in the Court of Common Pleas for Anderson County, South Carolina, on February 3, 2009, and was removed to this court on February 19, 2009, under 28 U.S.C. §§

1332(d), 1441, 1446, and 1453.  <u>Arthur</u> was filed in the United States District Court for the

District of Southern California on January 14, 2009.  On March 26, 2009, the <u>Terry</u> plaintiffs

filed a motion with the Judicial Panel on Multidistrict Litigation to have their action

consolidated with related actions and transferred to the District of South Carolina or the

District of Nevada.  On June 12, 2009, the United States Judicial Panel on Multidistrict

Litigation issued an order transferring the <u>Arthur</u> action to the District of South Carolina for

coordinated or consolidated pretrial proceedings.  SunTrust and the individual defendants

thereafter filed a number of motions to dismiss, though the claims against the individual

defendants were stayed pursuant to an order of this court dated January 21, 2010 (Dkt. No.

100].

II.    <u>Discussion</u>

    A.    Legal Standard on a Motion to Dismiss

    Pursuant to Rule 8(a)(2), a complaint must contain a "short and plain statement of the

claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a

motion to dismiss, a complaint must allege "sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, __U.S.__, 129 S. Ct.

1937, 1949 (2009) (<u>quoting</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>

Recitals of the elements of causes of action bolstered only by conclusory statements are

insufficient, a plaintiff cannot rest on a showing of a "sheer possibility that a defendant has acted unlawfully." Id.

Pursuant to Iqbal and Twombly, this court must undertake a two-prong approach in determining the sufficiency of plaintiff's complaint. First, bearing in mind that a court must accept as true all factual allegations in the complaint, this court must segregate allegations that are factually supported from those which are mere legal conclusions or naked assertions and not entitled to a presumption of truth. Iqbal, 129 S. Ct. at 1950. Second, this court must determine whether the remaining factual allegations in the complaint state a plausible claim for relief, based on "judicial experience and common sense." Id.

B.     Applicable Law

In a diversity action, a federal court must apply the choice of law rules of the state in which it sits. Klaxton Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). Where a transferee court presides over several diversity actions consolidated by the multidistrict litigation panel, the choice of law rules applied are that of each jurisdiction in which the transferred actions were originally filed. Change v. Baxter Healthcare Corp., __ F.3d __, 2010 WL 1136521 (7th Cir. March 26, 2010); In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90, 81 F.3d 570, 576 (5th Cir. 1996). The Terry action originated in the Southern District of California while the Arthur action originated in District of South Carolina. California "will apply its own rule of decision unless a party invokes the law of a foreign state." Paulsen v. CNF Inc., 559 F.3d 1061, 1080 (9th Cir. 2009). If a party asserts that a

law other than California's should apply, the court must undertake the "governmental interest" analysis to determine the applicable substantive law. Reich v. Purcell, 432 P.2d 727 (Cal. 1967). No party to the Arthur action asserts that a particular law should apply, and in the absence of such an argument the court will apply the law of California to the Arthur Customers. South Carolina subscribes to the doctrine of lex loci delicti, and applies the law of the place of the wrong. Dawkins v. State, 412 S.E.2d 407, 408 (S.C. 1991). All wrongs alleged in the complaint appear to have occurred in Richmond, Virginia. As such, the court will apply the law of Virginia in ruling on the Terry claims.

C.     Aiding and Abetting Breach of Fiduciary Duty

The Customers assert that SunTrust "knowingly assisted LES in breaching its fiduciary duties and converting the Plaintiff's Exchange Funds by allowing the Funds to be used to fund older exchanges at LES, which could not be funded because of LES's imprudent investments in ARS sold to LES by SunTrust's subsidiary." (Am. Compl. ¶ 21.) In order for the Customers to state a claim for aiding and abetting breach of fiduciary duty they must sufficiently allege: (1) an independent primary wrong, (2) actual knowledge of the wrong, and (3) substantial assistance in the wrong. Impac Warehouse Lending Group v. Credit Suisse First Boston, LLC, 8:04-1234, at *14 (C.D. Cal. June 20, 2006) aff'd 270 Fed. App'x 570 (9th Cir. March 17, 2008); Howard v. Superior Court, 3 Cal. Rptr. 2d 575 (Cal. Ct. App. 1992) ("[W]hile aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in

tortious activity for the purpose of assisting another in performing a wrongful act."); <u>Halifax</u>

<u>Corp. v. Wachovia Bank</u>, 604 S.E.2d 403, 411–12 (Va. 2004) (assuming without deciding

that Virginia recognizes aiding and abetting liability for breach of fiduciary duty, and

assuming such a claim exists, requiring (1) actual knowledge of breach and (2) participation

in the breach). Additionally, causation is an essential element of an aiding and abetting claim

as the plaintiff "must show that the aider and abettor provided assistance that was a

substantial factor in causing the harm suffered." <u>Neilson v. Union Bank of Ca., N.A.</u>, 290

F. Supp. 2d 1101, 1135 (C.D. Cal. 2003).

        1.    Actual Knowledge

Aider and abettor liability must be premised on "actual knowledge of the primary

violation." <u>Neilson v. Union Bank of Ca., N.A.</u>, 290 F. Supp. 2d 1101, 1119 (C.D. Cal.

2003); <u>Halifax Corp. v. Wachovia Bank</u>, 604 S.E.2d 403, 414 (Va. 2004) ("A bank

participates in numerous transactions every day involving the acceptance and deposit of

checks. Yet, unless it actually knows a breach of fiduciary duty is occurring and participates

with <u>mens rea</u> in the consummation of the breach, it should not be held liable for aiding and

abetting the breach."). Constructive knowledge will not do. <u>Gerard v. Ross</u>, 251 Cal. Rptr.

604 (Cal. App. Dist. 1988). Actual knowledge requires "knowledge of the specific primary

wrong the defendant substantially assisted." <u>Casey v. U.S. Bank Nat. Ass'n</u>, 26 Cal. Rptr.

3d 401, 406 (Cal. Dist. Ct. App. 2005). In other words, actual knowledge in the aider and

abettor context requires intentional participation with knowledge of the end sought to be

attained.  <u>Lomita Land & Water Co. v. Robinson</u>, 97 P. 10, 15 (Cal. 1908); <u>Halifax</u>, 604 S.E.2d 403.

The Customers allege that the primary violation was LES's breach of fiduciary duty. The Customers allege the breach of fiduciary duty occurred when LES used the Customers' Exchange Funds to be used to fund older exchanges at LES.  Accordingly, the court must determine whether the complaint plausibly avers that SunTrust had actual knowledge of and provided substantial assistance in carrying out the alleged acts.  To charge SunTrust with knowledge of LES's alleged breach of fiduciary duty, the Customer's must show that SunTrust actually knew: (1) that LES used Exchange Funds from the Customers (2) for purposes LES was not entitled to.  To that end the Customers contend that paragraphs 11, 63, 84–93, 95–97, 99, 111, 112, 119, 126, 183–87 of the complaint set forth sufficient facts to establish SunTrust's actual knowledge of LES's actions.  Pursuant to the Supreme Court's charge in <u>Iqbal</u>, the court will segregate legal conclusions and naked assertions from fact in evaluating SunTrust's knowledge.

   a.   What Did SunTrust Know Regarding LES's Activities?

The complaint alleges that SunTrust knew that the ARS purchased by LES had dramatically declined in value and that the ARS had been purchased with Exchange Funds, which jeopardized LES's ability to meet exchange obligations.  (Am. Compl. 11, 63, 84, 119.)  The complaint also alleges that SunTrust knew this because LES was in constant contact with SunTrust regarding a solution to this issue.  (<u>Id.</u> ¶ 63.)  Accordingly, the court

finds that the Customers have adequately alleged that SunTrust knew LES purchased ARS and that the ARS's illiquidity was causing LES to run low on resources available to fund exchanges.

### i.     The Gluck Letter

The question remains however as to what SunTrust knew about LES's acts regarding the 3318 Account in response to its pending illiquidity. That is to say whether SunTrust knew that LES was using new Exchange Funds to complete pending transactions. The Customers make much of an October 7, 2008 letter from Michelle H. Gluck ("Gluck"), LFG's Executive Vice President and Chief Legal Officer, to SunTrust on behalf of LES. (Compl. ¶ 86.) The complaint alleges that the letter informed SunTrust that LES was using its "'remaining non-ARS investments to satisfy Client's obligations' because 'virtually all of the remaining escrow investments consist of ARS.'" (Id.) The Customers seek an inference that "remaining non-ARS investments" necessarily meant Exchange Funds in the 3318 Account. This inference does not follow. As an initial matter, it is not plausible to argue that Exchange Funds in the 3318 Account are investments. If anything, they are deposits. The Gluck letter, as its contents are alleged in the complaint, fails to mention the 3318 Account or indicate that the "remaining non-ARS investments" consisted solely of Exchange Funds. The complaint does not sufficiently make clear that SunTrust knew, from the Gluck letter, that LES intended to use the Customers' money in the 3318 Account to complete § 1031 transactions for other individuals. In any event, the Gluck letter, as

represented in the complaint, makes no mention whatever that LES intended to use future customers money to complete existing exchanges.

For the letter to have transmitted sufficient notice of a potential breach of fiduciary duty, it would have needed to indicate that no assets of any kind existed to complete pending § 1031 transactions, that new Exchange Funds were being deposited in the 3318 Account, and that LES was using the new Exchange Funds on deposit from the Customers, rather than investments, to complete transactions for individuals whose funds were tied up in ARS. As alleged in the complaint, the Gluck letter appears to stand for the fact that LES was experiencing financial difficulty and had exhausted existing non-ARS investments, not as a statement of intention to rob Peter to pay Paul.

ii.   The 3318 Account

Paragraphs 21 and 184 allege that the 3318 Account was a commingled operating account and that SunTrust was aware of this fact. (Compl. ¶¶ 21, 184(xiii).) The import of the Customer's allegation is important because there is nothing about the nature of a commingled operating account that should draw any special attention from a bank nor gives rise to any presumption of duty. As stated by the Supreme Court of Virginia, "[a] bank participates in numerous transactions every day involving the acceptance and deposit of checks. Yet unless it actually knows a breach of fiduciary duty is occurring and participates with mens rea in the consummation of the breach, it should not be liable for aiding and abetting the breach." Halifax, 604 S.E.2d at 414. In short, there is nothing out of the

ordinary about large fluctuations in an operating account sufficient raise any red flags to SunTrust.

### iii.    The Exchange Agreement

The Exchange Agreement defines the legal relationship between LES and the Customers and provides that the Exchange Funds will be deposited in "an account maintained in Richmond, Virginia" and that LES "unconditionally guarantees the return and availability of the Exchange Funds" at a specified rate of interest.  (Am. Compl. Ex. 1 at 4–5.)  In assessing aider and abettor liability in the context of a § 1031 transaction gone awry, courts have found the exchange agreement particularly salient in determining knowledge of the fiduciary status of the intermediary and the duties created by the agreement.  See Cahaly v. Benistar Prop. Exch. Trust Co., Inc., 885 N.E.2d 800 (Mass. 2008).  Without reaching the question of whether the Exchange Agreement creates a fiduciary duty, the court finds that the Customers have failed to factually support their conclusory assertion that SunTrust possessed the Exchange Agreement.  Their purported rationale, that SunTrust's underwriting guidelines requires it, is not plausible because the Customer's have failed to allege that such guidelines apply to any relationship between LES and SunTrust.  LES has not adequately pled possession of the Exchange Agreement sufficient to rely on it in pursing claims against SunTrust.

### iv.    The Remaining Paragraphs the Customers Rely on State Only Legal Conclusions and Naked Assertions

Paragraphs 111, 112, and 187 of the complaint allege that SunTrust knew a variety

of facts, though provide little factual enhancement to support the allegations. The court notes that if factual enhancement existed to support the claims in these paragraphs, they would likely meet the pleading threshold to satisfy actual knowledge. However no factual enhancement has been offered. The bodies of paragraphs 111, 112, and 187 are rife with exactly the type of naked assertions not entitled to a presumption of truth. Iqbal, 129 S. Ct. at 1950. Accordingly, the court finds the allegations contained in these paragraphs inadequate to establish actual knowledge pursuant to Iqbal.

2. Participation

SunTrust asserts that merely housing accounts for a third party does not amount to participation in the alleged breach of fiduciary duty. The Customers assert that while SunTrust generally does not owe duties to nondepositors, it did owe a duty to refrain from knowingly assisting a fiduciary in breaching fiduciary duties. Essentially, the Customers assert that mundane tasks performed by banks become intentional torts when accompanied by a particular type and sufficient level of knowledge.

Participation, or substantial assistance, is an essential element of a claim for aiding and abetting breach of fiduciary duty under both Virginia and California law. Neilson, 290 F. Supp. 2d 1101, 1118; Halifax, 403 S.E.2d at 414 . California requires that SunTrust's participation was a "substantial factor" in bringing about the injury purportedly suffered. Id. However both states have considered the question of whether ordinary business transactions may constitute substantial assistance in the aider and abettor context and answered that

question in the affirmative. Casey v. U.S. Bank Nat. Ass'n, held that "ordinary business transactions" a bank performs for a customer can satisfy the substantial assistance element of an aiding and abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort." 26 Cal. Rptr. 3d 401, 406 (Cal. Ct. App. 2005). Similarly, Halifax held that "[a] bank participates in numerous transactions every day involving the acceptance and deposit of checks. Yet unless it actually knows a breach of fiduciary duty is occurring and participates with mens rea in the consummation of the breach, it should not be liable for aiding and abetting the breach." Halifax, 604 S.E.2d at 414. The necessary implication from the Virginia Supreme Court's holding in Halifax is that with a sufficient type and level of knowledge, the numerous everyday transactions a bank participates in may become grounds for aider and abettor liability. Accordingly, the participation prong, in the banking context, melds into the actual knowledge prong discussed above.

SunTrust argues that participation must be "significant and active." However, the cases SunTrust cites for its proposition construed aider and abettor liability in the context of federal securities regulation, involve construction of federal law, and are inapposite. See, e.g., Alfus v. Pyramid Tech. Corp., 745 F. Supp. 1511 (setting for the elements necessary to state a claim for aiding and abetting a violation of Rule 10b). Notably, the Ninth Circuit's affirmance of Impac Warehouse Lending Group v. Credit Suisse First Boston, LLC, 8:04-1234, at *14 (C.D. Cal. June 20, 2006) aff'd 270 Fed. App'x 570 (9th Cir. March 17, 2008)

used the substantial factor test of <u>Neilson v. Union Bank of Ca., N.A.</u>, 290 F. Supp. 2d 1101

(C.D. Cal. 2003) rather than the significant and active test of <u>Alfus</u>.

B.    Conversion and Aiding and Abetting Conversion

The Customers contend that SunTrust "converted and aided and abetted LES's

conversion by using [the Customers'] Exchange Funds for unauthorized purposes and

destroying [the Customers'] intangible property rights." (Am. Compl. ¶ 193.)  Specifically,

the Customers' allege that SunTrust converted the Customers' intangible property rights

merged within the Exchange Agreement including (1) the right to replacement property; (2)

the right associated with deferring taxable gain; and (3) the unconditional guarantee of the

return of the Exchange Funds.    The complaint also alleges that SunTrust's use of the

Exchange Funds for unauthorized purposes constituted conversion.

1.    Conversion

Under Virginia law, "[a] person is liable for conversion for the wrongful exercise or

assumption of authority over another's goods, depriving the owner of possession, or any act

of dominion wrongfully exerted over the property in denial of, or inconsistent with, the

owner's rights."  <u>Simmons v. Miller</u>, 544 S.E.2d 666, 679 (Va. 2001).  "It is not necessary

that there be a manual taking of the property; it is only necessary to show an assumption of

control or ownership over the property, or that the alleged converter has applied the property

to his own use."  <u>Federal Ins. Co. v. Smith</u>, 144 F. Supp. 2d 507, 520 (E.D. Va. 2001)

(<u>quoting</u> <u>Oakdale Village Group v. Fong</u>, 50 Cal. Rptr. 2d 810, 812 (Cal. Ct. App. 1996));

but see Univ. C.I.T. Credit Corp. v. Kaplan, 92 S.E.2d 359 (Va. 1956) ("it is not necessary that the wrongdoer apply the property to his own use"). In general, a cause of action for conversion applies only to tangible property, "[h]owever many courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond," United Leasing Corp. v. Thrift Ins. Corp., 440 S.E.2d 902, 906 (Va. 1994). However, a cause of action for conversion does not encompass claims for undocumented intangible property rights. Id., Fremont Indem. Co. v. Fremont Gen. Corp., 55 Cal. Rptr. 621, 638 (Cal. Ct. App. 2007). The touchstone for recognizing a documented intangible property right is whether the right amounts to "a clear, definite, undisputed, and obvious property right in a thing to which they are entitled to immediate possession." Id. Under California law, the test is substantially similar. See Wanetick v. Mel's of Modesto, Inc., 811 F. Supp. 1402, 1409 (N.D. Cal. 1992) ("To bring an action for conversion, a plaintiff must establish that he or she had actual possession of the property . . . or the right to immediate possession of the property at the time the alleged conversion occurred."). However, California appears to differs to a degree, only requiring some connection between a document or something tangible and the purportedly converted property right. Kremen v. Cohen, 337 F.3d 1024, 1033 (9th Cir. 2003).

In the case of funds, an action for conversion is proper where "the amount of money [is] readily ascertainable," PCO, Inc., v. Christiansen, Miller, Fink, Jacobs, Glaser Weil & Shapiro, LLP, 58 Cal. Rptr. 3d 516, 525 (Cal. Ct. App. 2007), and that the plaintiff was

entitled to immediate possession at the time the funds were allegedly converted.  Terry v. Bank of Am., N.A., 350 F. Supp. 2d 727, 729–30 (W.D. Va. 2004); Wanetick v. Mel's of Modesto, Inc., 811 F. Supp 1402 (N.D. Cal. 1992); Fischer v. Machado, 58 Cal. Rptr. 2d 213 (Cal. App. 3 Dist 1996) (To establish conversion, plaintiff must establish actual interference with his ownership or right of possession.).

a.    Conversion of Intangible Property Rights

The court finds that the Customers' right to replacement property, and the right associated with deferring taxable gain are undocumented intangible property rights not properly subject to an action for conversion.  Unlike the domain name at issue in Kremen or net operating loss at issue in Fremont, the right to replacement property and to defer taxable gain are highly speculative and incapable of ready calculation.  Accordingly, the court finds that the rights the Customers seek simply are not clear, definite, and obvious enough to support a claim for conversion.

The Customers' claim for conversion of their right to return of Exchange Funds also fails.  Rather than a claim for interference with property rights, the Customers appear to seek remedy for an alleged violation of an intangible contract right.  Such rights are protected by contract law, not tort law.  Boon Rawd Trading Intern. Co., Ltd. v. Paleewong Trading Co., Inc., __ F. Supp. 2d __, 2010 WL 668063 *11 (N.D. Cal. February 19, 2010).  Accordingly, the court hereby dismisses the Customer's conversion claim insofar as it attempts to recover for conversion of intangible contract rights.

b.    Conversion of Exchange Funds

The Customers also allege that SunTrust converted their Exchange Funds by allowing LES to complete § 1031 exchanges of existing customers with the funds of the Customers. The act at issue here is LES's alleged use of the Exchange Funds to fund exchanges for existing customers.  To the extent that SunTrust exerted control over funds in the 3318 Account, the allegations in the complaint fail to establish that such control was wrongful or hostile to any property interest of the Customers.  That is because the Exchange Agreement provides that "LES shall have sole and exclusive possession, dominion, control and use of all Exchange Funds, including interest until the first business day after any of the following occur:" (1) the expiration of the identification period; (2) the identification of target property; (3) the earlier of 180 days or the due date of a customers tax return , or (4) the occurrence of a material and substantial contingency.  The Exchange Agreement goes on to further state that the Customers "shall have no right, title, or interest in or to the Exchange Funds or any earnings thereon and [the Customers] shall have no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any Exchange Funds . . . except that balance of Exchange Funds . . . shall be paid to [the Customers] on the applicable Termination Date."  (Am. Compl. Ex. 1 at 4.)

The Exchange Agreement further provides that the Termination Date shall in no event shall take place prior to the end of the 45 day identification period.  Accordingly, the Exchange Agreement makes clear that under no circumstances may a customer access his

Exchange Funds for 45 days after initiating the § 1031 exchange process. The court finds that the 45 day period during which the Customers have no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any Exchange Funds prevents the customers from now asserting that they had a right to immediate possession of such funds. Accordingly, the court finds that because the Customers did not possess an immediate right to possession, their claim for conversion of the Exchange Funds fails to state a claim for which relief may be granted.

### 2. Aiding and Abetting Conversion

As discussed above, aider and abettor liability may be imposed where a plaintiff establishes actual knowledge and participation in the underlying tort by the defendant. Nelson v. Union Bank of Cal., N.A., 290 F. Supp. 2d 1101, 1118 (C.D. Cal. 2003). For the reasons discussed above in Part II.C.1, the court finds that the complaint fails to adequately allege that SunTrust had actual knowledge that LES was violating any duty, committing any tort, or otherwise acting inappropriately. See, e.g., Cahaly, 885 N.E.2d 800 (actual knowledge not possible where information only indicated that (1) defendant was a qualified intermediary, (2) an account held third-party funds, and (3) such funds were transferred to trading account).

The Customers also fail to adequately allege participation. Participation is defined as substantial assistance in committing the wrong, and requires the defendant's actions to be a substantial factor in causing the plaintiff's injury. Nelson, 290 F. Supp. 2d 1128. The court

finds that SunTrust's actions, in engaging in normal banking practices, absent knowledge, cannot constitute participation in the conversion of the Exchange Funds.  Accordingly, the Customers claim for aiding and abetting conversion fails for inadequate allegations of knowledge and participation.  However, even if SunTrust had knowledge of LES's alleged acts, and participated in them, it could not be held liable due to the lack of a primary violation.  Also, and perhaps most importantly,  the Customers lacked an immediate right to possess the funds, and, as such, cannot state a claim for the underlying tort of conversion. Accordingly, the court dismisses the Customers' claim for aiding and abetting conversion.

C.      Conspiracy

To prove civil conspiracy, a plaintiff must allege (1) the formation and operation of a conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts.  See, e.g., Wasco Prod., Inc. v. Southwall Technologies, Inc., 435 F.3d 989, 992 (9th Cir. 2006), Firestone v. Wiley, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (noting that the Supreme Court of Virginia requires proof that the underlying tort was committed—where there is no underlying wrong, there can be no action for civil conspiracy). To survive a motion to dismiss, Virginia requires a plaintiff to allege some details of time and place and the alleged effect of the conspiracy, Firestone, 485 F. Supp. 2d at 704, and California requires more than bare legal conclusions.  117 Sales Corp. v. Olsen, 145 Cal. Rptr. 778, 780 (Cal. Ct. App. 1978).

The court reads the relevant state-court elements in conjunction with the pleading

requirements set forth in <u>Iqbal</u> to require the Customers to set forth sufficient factual matter to allow the court to plausibly conclude that LES and SunTrust agreed to engage in concerted action. The court has thoroughly reviewed the complaint and finds that the Customers' allegation that the conspiracy formed between February and November of 2008 in Richmond, Virginia, does not contain sufficient factual matter to move the Customers' conspiracy claim from the conceivable to the plausible. Accordingly, the Customers' claim for civil conspiracy is dismissed.

III.    <u>Conclusion</u>

Based on the forgoing, the court hereby dismisses the Customers' complaint, insofar as it relates to SunTrust, for failure to state a claim upon which relief may be granted. The court dismisses the aiding and abetting breach of liability claim for want of actual knowledge of the primary wrong; the conversion and aiding and abetting conversion claims because the Customers did not have an immediate right to possession of the Exchange Funds; and the civil conspiracy claim because the complaint fails to adequately allege an agreement to act. Each dismissal shall be without prejudice and with leave to refile pursuant to <u>Twombly</u> and <u>Iqbal</u>, should the Customers find themselves able to supplement their complaint with factual matter bearing on the elements the court identified. Any amended complaint shall be filed on or before July 19, 2010.

IT IS SO ORDERED.

June 2, 2010
Columbia, South Carolina

Joseph F. Anderson, Jr.
United States District Judge